**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HALO CREATIVE & DESIGN LIMITED, a Hong Kong company, HALO TRADEMARKS LIMITED, a Hong Kong company and HALO AMERICAS LIMITED, a Hong Kong company, | ) ) ) ) ) | |
| *Plaintiffs and Counter-Defendants* | ) ) | Civil Action No. 1:14-cv-08196 |
| v. | ) ) | Judge Harry D. Leinenweber |
| COMPTOIR DES INDES INC., a Quebec corporation, CDI INTERNATIONAL, and CDI FURNITURE, | ) ) ) ) ) | Magistrate Judge Susan E. Cox |
| *Defendants and One Counter-Plaintiff.* | ) | |

**PLAINTIFFS' MEMORADUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Richard D. Harris
Barry R. Horwitz
GREENBERG TRAURIG, LLP
77 West Wacker Drive
Suite 3100
Chicago, Illinois 60601
(312) 456-8400
(312) 456-8435 (Fax)

*Attorneys for Halo Creative & Design
Limited, Halo Trademarks Limited and Halo
Americas Limited*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.    BACKGROUND .................................................................................... 3

III.   LEGAL STANDARDS APPLICABLE TO SUMMARY JUDGMENT ........................... 4

IV.   HALO IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON COUNT III OF HALO'S FIRST AMENDED COMPLAINT AGAINST CDI – HALO'S DESIGNS ARE COPYRIGHTABLE WORKS. ................................................. 5

    A.   The Elements of Copyrightability for Useful Articles. ........................... 5

        1.   Originality ................................................................... 5
        2.   Copyrightability of the Subject Matter (Useful Articles) ........... 6

    B.   Halo's Product Designs Contain Pictorial, Graphic and Sculptural Features That Can Be Perceived As Works Of Art Separate From The Useful Article, And Would Quality As Protectable Works If Imagined Separately Therefrom. ................................................................. 9

        1.   Halo's Product Designs Are Original. ........................... 9
        2.   Halo's Product Designs Include Pictorial, Graphic and/or Sculptural Features That Can Be Perceived As Works of Art Separate From The Useful Article, Which Features Would Qualify As Protectable Works If Imagined Separately From the Useful Article. ..................................................... 9

            (a)   Halo's ODEON™ Chandeliers, ODEON™ Table Lamp and ODEON™ Floor Lamp ............................... 9
            (b)   Halo's Zig Zag Chandelier, Zig Zag Table Lamp and Zig Zag Floor Lamp ............................................ 11
            (c)   Gyro Crystal Chandelier ..................................... 12
            (d)   Halo's Crystal Chandeliers .................................. 14
            (e)   Halo's Aviator Tomcat Chair ................................ 15
            (f)   Halo's Mars Chair ............................................. 16
            (g)   Halo's Aviator Valkyrie Desk ............................... 17
            (h)   Halo's Blackhawk Coffee Table, Blackhawk Chest and Blackhawk Square Side Table ......................... 18
            (i)   Halo's Globetrekker Coffee Table ......................... 19
            (j)   Halo's Stonyhurst Lamp Table and Ampleforth Chest ....... 20
            (k)   Halo's Georgian Architectural Mirror ..................... 21
            (l)   Halo's Georgian Architectural Dining Table .............. 22
            (m)  Halo's Scaffolding Coffee Table and Scaffolding Console Table .................................................. 23
            (n)   Halo's Oviedo Chaise ........................................ 24

V.    HALO IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF CDI'S COUNTERCLAIM:  SHAM LITIGATION / ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT ................. 25

A.  The Required Elements for Sham Litigation / Attempted Monopolization Claims. ........................................................................... 25

B.  CDI Cannot Establish Its Sham Litigation / Attempted Monopolization Claims. ........................................................................... 26

    1.  Sham Litigation ........................................................................... 26
    2.  Attempted Monopolization ......................................................... 26

VI.  HALO IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS III AND IV OF CDI'S COUNTERCLAIM – INTENTIONAL INTERFERENCE WITH PROPECTIVE ECONOMIC ADVANTAGE AND BUSINESS EXPECTANCY ......... 29

A.  The Required Elements for Intentional Interference with Prospective Economic Advantage and Business Expectancy Claims. ..................................... 29

B.  CDI Cannot Establish Its Claims of Intentional Interference ............................. 29

VII.  CONCLUSION ........................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................4

*Asahi Glass Co. v. Pentech Pharm. Inc.*,
    289 F. Supp. 2d 986 (N.D. Ill. 2003) ...................................................................25

*Avnet, Inc. v. Motio, Inc.*,
    Case No. 12-C-2100, 2015 U.S. Dist. LEXIS 10799 (N.D. Ill. Jan. 30, 2015) ....................25

*Bodenstab v. J. R. Blank & Assocs., Inc.*,
    Nos. 88 C 6125, 88 C 6135, 1989 U.S. Dist. LEXIS 679
    (N.D. Ill. Jan. 25, 1989) ......................................................................................30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................4

*Delloma v. Consolidation Coal Co.*,
    996 F.2d 168 (7th Cir. 1993) ................................................................................29

*Eastern R.R. Presidents Conference v. Noerr Moto Freight*,
    365 U.S. 127 (1961) ..............................................................................................24

*FASA Corp. v. Playmates Toys, Inc.*,
    912 F. Supp. 1124 (N.D. Ill. 1996) ....................................................................6, 8

*Feist Publ., Inc. v. Rural Telephone Serv. Co.*,
    499 U.S. 340 (1991) ............................................................................................4, 5

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ..............................................................................26

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1981) ................................................................................28

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ................................................................................................4

*Menasha Corp. v. News America Marketing In-Store*,
    238 F. Supp. 2d 1024 (N.D. Ill. 2003) .................................................................27

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ................................................................................25

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998) ............................................................................25

*Pivot Point v. Charlene Prods., Inc.*,
    372 F.3d 913 (7th Cir. 2004) ..................................................................................6

*Schrock v. Learning Curve Int'l, Inc.*,
    586 F.3d 513 (7th Cir. 2009) ..............................................................................5, 6

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
  580 U.S. ____, No. 15-866, slip op.
  (March 22, 2017) ...............1, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24

*Thermos Co. v. Igloo Prods. Corp.*,
  1995 U.S. Dist. LEXIS 18382 (N.D. Ill. Dec. 12, 1995) .......................................................26

*United Phosphorus Ltd. v. Angus Chem. Co.*,
  1996 U.S. Dist. LEXIS 203 (N.D. Ill. Jan. 9, 1996) .............................................................29

**Illinois State Cases**

*Anderson v. Vanden Dorpl.*,
  667 N.E. 2d. (Ill. 1996)...........................................................................................................28

**Federal Statutes**

15 U.S.C. § 2 ..................................................................................................................................25, 26

17 U.S.C. § 101 .............................................................................................................................2, 6, 26

17 U.S.C. § 102 .................................................................................................................................5

17 U.S.C. § 104(b)(1) ........................................................................................................................5

17 U.S.C. § 411(a) ............................................................................................................................26

**Other Authorities**

Berne Convention for the Protection of Literary and Artistic Works, Art. 5(2),
  Sept. 9, 1886 ........................................................................................................................5

1 David Nimmer, <u>Nimmer on Copyright</u>, § 2.01[A] (2010)...................................................5, 6

1 David Nimmer, <u>Nimmer on Copyright</u>, § 2.08[B][3] (2010) ................................................7

1 David Nimmer, <u>Nimmer on Copyright</u>, § 5.05 (2010) .......................................................5

1 David Nimmer, <u>Nimmer on Copyright</u>, § 7.01[A] (2010).....................................................5

4 David Nimmer, <u>Nimmer on Copyright</u>, § 13.01[A] (2010)....................................................5

H.R. 4262, 100th Cong. (1988) (enacted)..........................................................................26

H.R. Rep. No. 94-1476, at 55 (1976).....................................................................................7

N.D. Ill. Crim. R. 56.1 .............................................................................................................3

## I.    INTRODUCTION

Plaintiffs Halo Creative & Design Limited, Halo Trademarks Limited and Halo Americas Limited (collectively "Halo") filed their original Complaint against Defendant Comptoir Des Indes Inc. and its apparent alter egos, CDI International and CDI Furniture (collectively "CDI"), on October 20, 2014. The Complaint alleged that CDI misappropriated and copied dozens of Halo's original furniture and lighting product designs, representing some of Halo's most iconic and best-selling products. (Dkt. No. 1, 67.) At trial, the evidence will show that the Montreal-based CDI built its business in the United States on the back of Halo's design studio—by selling cheap (sometimes defective) copies (or "versions") of the popular products sold by Halo's primary customer, the "hottest retailer" in the modern furniture space: Restoration Hardware (RH). CDI sold copies of numerous products carried by RH (only some of which were designed by Halo), often under the same or similar trademark as the original "version" sold by RH.

CDI has attempted again and again to dismiss this case based on claims of inconvenience (Dkt. No. 20), and unfounded arguments that Halo cannot assert its rights because Halo's copyrights are not registered (Dkt. No. 73)—but Halo's case survives. CDI has now staked its defense on its position that Halo's product designs are not entitled to copyright protection because they are "useful articles lacking physical or conceptual separate artistic elements." (Dkt. No. 94, ¶ 24.) That long-questioned standard was vitiated this year by the Supreme Court, in *Star Athletica, L.L.C. v. Varsity Brands, Inc.*. 580 U.S. ____, No. 15-866 (slip op., 15) (March 22, 2017). Under *Star Athletica*, owners of copyrights in useful articles must merely identify one or more features in an article that would have been eligible for copyright protection as a graphic or sculptural work—if it could be originally fixed in some "tangible medium other than a useful article before being applied to a useful article." *Id*. at 8. Further, the Court explained that two-

1

dimensional and three-dimensional applied art will correlate to the contours of the articles on which they are applied. *Id.* at 11.

Each and every one of Halo's asserted product designs features graphic and/or sculptural features that "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101. For many designs, CDI's own corporate designee, its Director of Product Development, admitted that certain graphic/sculptural features could be imaginatively removed from the remainder of the article, and that those features would serve as a "piece of art." For other designs, Halo's Founder and Creative Director (chief designer) Timothy Oulton testified that certain features were designed to look like they could be removed and serve as their own artistic sculptures, and that Halo's customers often purchase Halo's products not for their utilitarian function, but "as a sculpture." The evidence establishes, and there is no genuine dispute, that the features identified below would have been eligible for copyright protection as graphic and/or sculptural works if first fixed in a tangible medium other than a useful article. Accordingly, the Court should grant partial summary judgment on Count III, that Halo's products are entitled to valid, enforceable copyright protection.

Finally, CDI has asserted baseless counterclaims that (1) this is purportedly "sham litigation" because Halo is enforcing its copyrights without registrations, (2) Halo somehow has monopoly power in the market for modern furniture, and (3) Halo purportedly interfered with CDI's potential business relationship with RH. But the first claim was defeated when this Court ruled that Halo need not have copyright registrations to enforce its copyrights (Dkt. No. 93), and CDI has no evidence at all to support the other two claims. In fact, Halo occupies only ▇▇▇▇ of the U.S. market for furniture, and could not possibly monopolize *any* relevant market. Further, CDI could have no reasonable expectation of a business relationship with RH,

because CDI never made any business overtures to RH, or vice versa. ███████████

████████████████████████████████████████████████████████████████████

█████████████ The Court should grant summary judgment in Halo's favor on Counts II, III and IV of CDI's Counterclaims.

## II.    BACKGROUND

Pursuant to Local Rule LR56.1, Halo files herewith its Statement of Undisputed Material Facts ("SOF"), attached as Ex. A, which sets forth all of the undisputed facts that entitle Halo to partial summary judgment on Count III of Halo's First Amended Complaint (FAC), and to summary judgment on Counts II, III and IV of CDI's Counterclaim.

Halo is a private, Hong Kong-based company that designs, manufactures and distributes highly ornamented furniture products and lighting fixtures throughout the world. (Dkt. No. 67, ¶ 2.) Halo's distinctive furniture and lighting products, which typically begin with a classic design or antique, to which Halo adds new, contemporary twists, have achieved significant commercial success, in part through its sales to prominent furniture retailers throughout the U.S., including its own Timothy Oulton retail stores, and Restoration Hardware (RH). (*Id.*)

CDI copied and sold nearly forty different products designed and sold by Halo, and other products sold by RH that were not designed by Halo. (*Id.*, ¶¶ 12, 19; Dkt. No. 67, ¶¶ 20-52.) CDI does not dispute that it began selling the accused products *after* it knew of RH's original versions of those products—it merely claims that it had the right to sell copies of products sold at RH because the product listing on RH's website purportedly did not have a copyright or patent notice. (Ex. A, SOF, ¶¶ 15-16.) CDI had no designers of its own until July 2014. (*Id.*, ¶ 9.)███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ The

parties have stipulated that (1) Halo is the owner of all right, title and interest in and to U.S.

3

Design Patent No. D655,526, U.S. Design Patent No. D655,100, and the trademark **ODEON™**, used with lighting fixtures; (2) those intellectual property rights are valid and enforceable; and (3) CDI sold products that infringe those intellectual property rights (*Id.,* ¶¶ 1-4.)

## III. LEGAL STANDARDS APPLICABLE TO SUMMARY JUDGMENT

A motion for summary judgment shall be granted when there is no genuine issue of material fact or when, drawing all reasonable factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where a party "fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be entered against that party. *Celotex,* 477 U.S. at 322 (1986).

Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The party opposing a motion for summary judgment may not raise a purported issue of fact by mere allegations or denials. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position." *Anderson*, 477 U.S. at 252. Rather, the nonmoving party must set forth evidence on which a jury could reasonably find for it. *Id.*

4

IV.  **HALO IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON COUNT III OF HALO'S FIRST AMENDED COMPLAINT AGAINST CDI – HALO'S DESIGNS ARE COPYRIGHTABLE WORKS.**

A.  **The Elements of Copyrightability for Useful Articles.**

To prevail on a claim of infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[1] *Feist Publ., Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 361 (1991). The first element "breaks down into the following constituent parts: (1) originality in the author; (2) copyrightability of the subject matter; (3) a national point of attachment of the work, such as to permit a claim of copyright;[2] (4) compliance with applicable statutory formalities;[3] and (5) (if the plaintiff is not the author) a transfer of rights or other relationship between the author and the plaintiff" enabling the plaintiff to be "the valid copyright claimant."[4] 4 Nimmer on Copyright, § 13.01[A] (2010). Since the last two elements do not apply here, and the third element is fulfilled by Halo being a national and domiciliary of Hong Kong, the only two remaining elements Halo must establish for each of its works are (1) originality; and (2) copyrightability of the subject matter. *Id.*

1.  **Originality**

Copyright protection extends to "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. The word "original" is not defined in the Copyright

---

[1] The second element—copying and infringement—is outside the scope of this motion.

[2] This element is governed by Section 104 of the Copyright Act, which "recognizes four 'points of attachment' by which foreign nationals can secure U.S. copyright protection," 1 Nimmer on Copyright, § 5.05 (2010), including where the author, on the date of first publication for each work, is a national or domiciliary of a treaty party. 17 U.S.C. § 104(b)(1). Halo is based in Hong Kong, China (Dkt. 1; Dkt. 67). China became a party to the Berne Convention on October 15, 1992, and Hong Kong reaps the benefits of that treaty. Ex. B, at 3; Ex. C. All of Halo's works were first published after October 15, 1992. (Dkt. No. 67-1.)

[3] This element no longer applies: the Court already held that Halo's works are not "United States works," and that Halo, as a foreign national, is not subject to any statutory formalities. (*See* Dkt. No. 93; Dkt. No. 67-1.) The Berne Convention expressly requires that exercising one's copyright rights in a foreign country "shall not be subject to any formality." *See* Berne Convention for the Protection of Literary and Artistic Works, Art. 5(2). In short, the Berne Convention eliminated the requirement of complying with statutory formalities, at least for foreign plaintiffs like Halo. *See* 1 Nimmer on Copyright, §§ 7.01[A]; 13.01[A] (stating that the formal requirements for copyright subsistence and ownership "are basically inapplicable during the Berne era").

[4] This element does not apply because Halo is the author of each work. (Dkt. No. 67-1.)

Act, but the Supreme Court has held that the word "means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity." *Feist*, 449 U.S. at 345. The amount of creativity required "is extremely low; even a slight amount will suffice." *Id.*; *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 519 (7th Cir. 2009) ("What is required is 'independent creation plus a modicum of creativity'").

Further, it is well established "that the originality necessary to support a copyright merely calls for independent creation, not novelty." 1 Nimmer on Copyright, § 2.01[A] (continuing: "Thus, a work will not be denied copyright protection simply because it is substantially similar to a work previously produced by others"). Therefore, "novelty" is irrelevant, and "the search for prior art that frequently goes into challenging a patent plays **no role** in copyright cases." *Id.* (emphasis added); *see FASA Corp. v. Playmates Toys, Inc.*, 912 F. Supp. 1124, 1146-47 (N.D. Ill. 1996). Thus, CDI cannot defeat Halo's copyright protection merely by submitting evidence of prior similar works. *Id.* at 1147. Even if some of Halo's product designs were inspired by classic or antique products, the Seventh Circuit has held that Halo's reinvented works will have sufficient originality to be copyrightable if there "is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors." *Schrock*, 586 F.3d at 516.

## 2. Copyrightability of the Subject Matter (Useful Articles)

At the outset, a "useful article" is defined under the Copyright Act as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. Further, the Copyright Act defines "pictorial, graphic and sculptural works" as including:

> two-dimensional and three-dimensional works of fine, graphic and **applied art**, photographs, prints, art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. **Such works shall include**

> *works of artistic craftsmanship insofar as their form* but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that *can be identified separately from, and are capable of existing independently of, <u>the utilitarian aspects of</u> the article*.

17 U.S.C. § 101 (emphases added).[5] This year, the Supreme Court issued an opinion that vastly changed the calculus for the copyrightability of useful articles, which abandoned the "physical" / "conceptual" separability distinction as unnecessary and unclear—just as Halo argued all along.

Specifically, in *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, the Court held "that a feature incorporated into the design of a useful article is eligible for copyright protection only if the feature (1) can be perceived as a two- or three-dimensional work of art separate from the useful article and (2) would qualify as a protectable pictorial, graphic, or sculptural work—either on its own or fixed in some other tangible medium of expression—if it were imagined separately from the useful article into which it is incorporated." 580 U.S. ___, No. 15-866 (slip op., 1-2) (March 22, 2017). The Court further held that the first element, separate identification, "is not onerous"—one "need only be able to look at the useful article and spot some two- or three-dimensional element that appears to have pictorial, graphic or sculptural qualities." *Id.* at 7. But the "independent existence" requirement can be more difficult to meet: the asserted "feature must be able to exist as its own pictorial, graphic or sculptural work" once it is been imagined apart from the useful article. *Id.* Thus, the "ultimate separability question" is whether the asserted feature "would have been eligible for copyright protection as a pictorial, graphic or sculptural work had it originally been fixed in some tangible medium other than a useful article." *Id.* at 8.

---

[5]For many years, applying this language "has presented the courts with significant difficulty." *Pivot Point v. Charlene Prods., Inc.*, 372 F.3d 913, 921 (7th Cir. 2004). That difficult task has been further complicated by the legislative history (language in a House Report), which suggested that unless there is some element of the useful article "that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article," copyright protection is not available. H.R. REP. NO. 94-1476, at 55. That language resulted in different tests for physical and conceptual separability, as well as a longstanding debate as to what constitutes conceptually separable matter subject to copyright protection. *See* 1 Nimmer on Copyright, § 2.08[B][3].

One key point of the *Star Athletica* case is that copyright protection is not precluded merely because the extracted feature embodies the shape or outline of the overall useful article. "Just as two-dimensional fine art corresponds to the shape of the canvas on which it is painted, two-dimensional applied art correlates to the contours of the article on which it is applied." *Id*. at 11. Likewise, just as three-dimensional fine art corresponds to the shape of an underlying utilitarian structure, that three-dimensional art will correlate to the contours of that structure on which it is applied. *See id*. Equally important is that the separability inquiry focuses on

> the extracted feature, and not any aspects of the useful article that remain after the imaginary extraction. The statute does not require the decisionmaker to imagine a fully functioning useful article without the artistic feature. . . . The statute [also] does not require the imagined remainder to be a fully functioning useful article at all, much less an equally useful one.

*Id.* at 13-14. Since the Court rejected "the view that a useful article must remain after the artistic feature has been imaginatively separated from the article," it necessarily abandoned the prior "distinction between 'physical' and 'conceptual' separability"—partly because "the statutory text indicates that separability is a conceptual undertaking." *Id*. at 14-15. With this profoundly clarified standard, Halo's asserted works are clearly subject to copyright protection.

Relying on the *Star Athletica* standard, some district courts have already ruled that decorative lighting products could be protected under copyright law. For example, in *Jetmax Limited v. Big Lots, Inc., et al*., 15-cv-9597 (slip op., 10-14.) (S.D.N.Y.  Aug. 28, 2017) (attached as Ex. D), the court ruled that decorative covers on a set of string lights are a "sculptural work" capable of existing independently from the utilitarian aspect of the light set, i.e. the light bulbs.

CDI continues to assert that Halo's designs are not subject to copyright protection because Halo's applications were refused by the Copyright Office—but CDI fails to recognize that the standard under which those copyright applications were examined was unequivocally repudiated by the United States Supreme Court in *Star Athletica*.

8

**B.** **Halo's Product Designs Contain Original Graphic and Sculptural Features That Can Be Perceived As Works Of Art Separate From The Useful Article, And Would Quality As Protectable Works If Imagined Separately Therefrom.**

**1.** **Halo's Product Designs Are Original.**

There is no genuine dispute that the asserted works are "original"—i.e., that Halo independently created each work. CDI's corporate representative admits that Halo designs its own furniture and lighting products. (SOF, ¶ 6.) Halo's Founder and Creative Director (chief designer) Timothy Oulton testified at length about Halo's design process, including the origin of each concept, and the attention to manufacturing detail, in numerous products. (*Id.*, Ex. 16, at 7:10-13, 32:14-35:7, 56:18-58:5, 61:7-63:7, 70:2-72:15, *passim*.) CDI certainly does not have any evidence that any of the asserted works were ***not*** independently created by Halo.[6] ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ This element is established by the evidence.

**2.** **Halo's Product Designs Include Graphic and/or Sculptural Features That Can Be Perceived As Works of Art Separate From The Useful Article, Which Features Would Qualify As Protectable Works If Imagined Separately From the Useful Article.**

**(a)** **Halo's ODEON™ Chandeliers, ODEON™ Table Lamp and ODEON™ Floor Lamp**

Halo's designs for the ODEON™ Chandeliers, the ODEON™ Table Lamp and the ODEON™ Floor Lamp (collectively, "the ODEON™ Product Designs") are copyrightable under *Star Athletica*. (Numerous images of the ODEON™ Product Designs are shown at Dkt. No. 67-1, pp. 90-93, 96-99, 102-105, 157-162, and Halo has attached selected images as Ex. E.) First,

---

[6] *FASA Corp. v. Playmates Toys, Inc.*, 912 F. Supp. 1124, 1146-47 (N.D. Ill. 1996) (stating "Novelty or uniqueness is not a requirement for copyright protection," and holding it not sufficient to defeat a claim of copyright protection merely by submitting evidence of prior similar works).

the ODEON™ Product Designs contain a series of cascading concentric circles (or, in one case, rectangles) of hanging prismatic crystals—two concentric circles for the ODEON™ Table Lamp and ODEON™ Floor Lamp, three concentric circles for the ODEON™ Chandelier Small, five concentric circles for the ODEON™ Chandelier Medium, and two concentric rectangles for the ODEON™ Rectangular Chandelier).  (SOF, ¶ 39.)  From the outside viewer's perspective, each concentric circle (or rectangle) increases in length as one moves from the outside edge of the product toward the shared center of the circle or rectangle.  (*Id.*, ¶ 40.) The original design elements of the ODEON™ Product Designs include the arrangement of cascading crystals and the shape of the prisms. (*Id.*, ¶ 41.) With these sculptural features, the products look like a cascading fluid, which does not "advance the utility of the article" as a lighting product. *Star Athletica,* 580 U.S. ___ (slip op., 13).

Second, those elements are able to exist as their own sculptural work, separate from the remainder of the article. Specifically, one can imagine the arrangement of concentric circles or rectangles of hanging prismatic crystals being removed from the light bulbs and light source, and hung from a ceiling, where they would stand on their own as a separate work of modern art. Indeed, CDI's own Director of Product Development admitted that the concentric arrays of hanging prismatic crystals could be imaginatively removed from the remainder of the article— i.e., the light bulb and source of light—and (1) the remaining light bulbs would continue to function as a light source to light a room; and (2) the concentric arrays of hanging prismatic crystals would serve as their own "artistic piece" or "piece of art." (SOF, ¶¶ 42-43.) As Halo's Timothy Oulton put it, Halo's customers buy its chandeliers not as a source of light, but "as a statement," to add decorative sculptures that accent rooms already illuminated by recessed lighting. (*Id.* ¶ 46.)

10

There is no genuine dispute that the suspended array of prisms arranged in concentric circles or rectangles at varied lengths within the ODEON™ Product Designs "would have been eligible for copyright protection" as a graphic or sculptural work if they had originally been fixed as a hanging sculpture of suspended prisms. *Star Athletica,* 580 U.S. ___ (slip op., 8); *see* SOF, ¶ 43. Thus, the ODEON™ Product Designs are copyrightable under *Star Athletica*.

**(b)** **Halo's Zig Zag Chandelier, Zig Zag Table Lamp and Zig Zag Floor Lamp**

Halo's designs for the Zig Zag Chandelier, the Zig Zag Table Lamp and Zig Zag Floor Lamp (collectively, "the Zig Zag Product Designs")[7] fulfill the *Star Athletica* standard for copyrightability . (Numerous images of the Zig Zag Product Designs are shown at Dkt. No. 67-1, pp. 108-111, and Halo has attached selected images as Ex. F.) First, the Zig Zag Product Designs contain a circular metallic "cage," comprising a metallic diamond latticework formed between two horizontal metallic circles; the cage contains isosceles triangles where it meets the metallic circles, and otherwise contains equilateral diamonds in between the metallic circles. (SOF, ¶ 44.) A single crystal sphere is suspended like a pendant from the apex of each diamond. (*Id.*)  The original design elements of the Zig Zag Product Designs include the metallic cage, and the arrangement of crystal balls suspended in each diamond. (*Id.*, ¶ 45.) With these sculptural features, the entire piece looks similar to chainmail, which does not "advance the utility of the article" as a lighting product. *See Star Athletica,* 580 U.S. ___ (slip op., 13).

Second, the metallic cage with suspended crystal spheres exists as its own sculptural work separate from the remainder of the article. Specifically, one can imagine the metallic cage with the numerous crystal spheres being removed from the chandelier, and hung from the ceiling

---

[7]The three Zig Zag Product Designs all feature the same original design elements—a metallic cage featuring a diamond latticework, in which a single crystal ball is suspended from the apex of each diamond. Ex. A, at ¶¶ 44-45. The difference between each of the three product designs is merely one of scale: the cage is smaller—and there are fewer diamonds (and, thus, fewer crystal spheres)—in the table lamp and floor lamp than there are in the chandelier.

or set on a stand, where it would serve as a separate work of modern art. CDI's own Director of Product Development admitted that the circular metallic cage with the crystal spheres could be imaginatively removed from the remainder of the article—i.e., the light bulb and source of light – and (1) the remaining light bulbs would continue to function as a light source, to light a room; and (2) the removed metallic cage with hanging spheres would serve as its own "piece of art." (SOF, ¶¶ 47-48.) Halo's customers buy its chandeliers not as a source of light, but "as a statement," to add decorative sculptures that accent rooms already illuminated by recessed lighting. (*Id*. ¶ 46.)

There is no genuine dispute that the metallic cage with crystal spheres "would have been eligible for copyright protection" as a graphic or sculptural work if it was originally fixed as a sculpture suspended from the ceiling—i.e., a circular metallic cage having diamond latticework, where crystals are suspended within each diamond. *Star Athletica*, 580 U.S. ___ (slip op., 8); *see* SOF, ¶ 48. Thus, the Zig Zag Product Designs are copyrightable under *Star Athletica*.

### (c) Gyro Crystal Chandelier

Halo's designs for the Gyro Crystal Chandelier, the Gyro Crystal Table Lamp and the Gyro Crystal Floor Lamp (collectively, "the Gyro Product Designs")[8] are copyrightable under *Star Athletica*. (Numerous images of the Gyro Product Designs are shown at Dkt. No. 67-1, pp. 114-119, and Halo has attached selected images as Ex. G.) First, the Gyro Product Designs contain a cage or "orb" comprised of aged metallic semi-circular tubes, all of which converge on a ring positioned at the horizontal equator of the orb; the orb surrounds a series of dangling crystals of various shapes and sizes. (SOF, ¶ 50.) The original design elements of the Gyro Product Designs include the "Gyro" orb, the little ring on the equator, and the "sum of the parts"

---

[8] The three Gyro Product Designs all feature the same original design elements. The difference between each of the three product designs is merely one of scale.

relative to the arrangement of crystals. (*Id*. ¶ 51.) With these sculptural features, the entire piece evokes the concept of a scientific gyroscope, while also evoking the look of an atom's nucleus, with electron paths formed by the metallic crystals, which imagery does not "advance the utility of the article" as a lighting product. *See Star Athletica,* 580 U.S. ___ (slip op., 13).

Second, the "Gyro" orb with the ring on the equator can exist as its own sculptural work separate from the remainder of the article. Likewise, the arrangement of crystals hanging "in a very ornate, decorative way" can be imaginatively removed and hung from the ceiling, where it could serve as "its own piece of art." (*Id*., ¶ 55.) Specifically, one can imagine the hanging crystals and/or metallic orb being removed from the chandelier, hung from a ceiling or set on a stand, and displayed on their own, as one or more separate works of modern art. CDI's Director of Product Development admitted that the metallic orb could be imaginatively removed from the remainder of the article—i.e., the light bulb, source of light, and faux candles, etc.—and (1) the remaining light bulbs would continue to function as a light source (in fact, removing the orb would have "a minimal effect on the lighting"); and (2) the orb could be placed on a table or hung from a ceiling, and it would serve as a separate "artistic work." (*Id*., ¶ 52-53.) CDI also admitted that the array of crystals hanging "in a very ornate, decorative way" could be removed, that the product would still "provide light," and that the removed arrangement of crystals could serve as its own "piece of art." (*Id*., ¶ 54-55.)

There is no genuine dispute that the metallic orb with a ring on the equator, or the arrangement of crystals in the Gyro Product Designs, "would have been eligible for copyright protection" as a graphic or sculptural work if they were originally fixed as one or more hanging sculptures. *Star Athletica,* 580 U.S. ___ (slip op., 8); *see* SOF, ¶ 53, 55. Thus, the Gyro Product Designs are copyrightable under *Star Athletica*.

13

### (d) Halo's Crystal Chandeliers

Halo's designs for its Crystal Chandeliers fulfill the copyrightability standard under *Star Athletica*. (Numerous images of the Crystal Chandeliers are shown at Dkt. No. 67-1, pp. 122-123, 126-129, and Halo has attached selected images as Ex. H.) First, the Crystal Chandelier designs each contain an artificially aged metallic structure that was designed to be a smaller, thinner frame, with dangling crystals of various shapes and sizes, hanging from various places on the metallic frame. (SOF, ¶ 56.) The original design elements of the Crystal Chandelier products include the "lightness" of the product, with a smaller, lighter frame, a rusted frame (a quirky design feature, since chandeliers typically do not oxidize or rust), with fewer crystals arranged in specific way, and the "lowermost crystal ball." (*Id.,* ¶ 57.)

Second, those elements are able to exist as their own sculptural work separate from the remainder of the article. Specifically, one can imagine the thin, rusted metallic structure and arrangement of crystals being removed from the chandelier, hung from a ceiling, and standing on its own as a separate work of modern art. Again, CDI's own corporate designee admitted that the arrangement of crystals within the 'Crystal Chandelier' products reflect numerous design choices, including the shape of the crystals, placement of the crystals and the shape of the metallic structures that holds up the crystals. (*Id.,* ¶ 58.) He further admitted that the arrangement of crystals could be imaginatively removed from the remainder of the article—i.e., the light bulb and source of light – and (1) the remaining light bulbs would continue to function and "provide light"; and (2) the arrangement of crystals hanging "in a very ornate, decorative way," could serve as "its own piece of art." (*Id*., ¶ 59.) Again, Halo's customers buy its chandeliers not as a source of light, but "as a statement," to add decorative sculptures that accent rooms already illuminated by recessed (and/or other) lighting. (*Id*., ¶ 46.)

14

There is no genuine dispute that the array of hanging crystals "would have been eligible for copyright protection as a pictorial, graphic or sculptural work" if it had originally been fixed as a rusted metallic sculpture with a unique and independently-created arrangement of hanging crystals. (*See* SOF, ¶ 59; *Star Athletica,* 580 U.S. ___ (slip op., 8).) Thus, the Crystal Chandelier products are copyrightable under *Star Athletica*.

### (e)     Halo's Aviator Tomcat Chair

Halo's design for its Aviator Tomcat Chair is likewise copyrightable under *Star Athletica*. (Numerous images of the Aviator Tomcat Chair are shown at Dkt. No. 67-1, pp. 38-44, and Halo has attached selected images as Ex. I.) First, the design has several features having graphic and/or sculptural qualities, including the three-dimensional metallic side sections emerging together in a shape similar to a wishbone, which envelop the seat, and which can also serve as an armrest. (SOF, ¶ 22.) The metallic side sections are decorated with an original two-dimensional pattern of stainless steel panels, riveted together, with a distressed, shiny metallic finish, and with leather positioned on the top. (*Id.*) The arms are artistic—they appear to be removable, leaving a seat portion that would still function as a chair. (*Id.,* ¶ 25.) The original design elements of the Aviator Tomcat Chair include the shape and arrangement of the arms, the "random panels," "the way the rivets are attached," "the stitching," and "the sum of its parts." (*Id.*) With these sculptural features, the piece evokes the cockpit of the iconic World War II-era British Spitfire fighter plane, which does not "advance the utility of the article" as a chair. *See Star Athletica,* 580 U.S. ___ (slip op., 13).

Second, those features can exist as their own sculptural work having an intricate graphic design, separate from the useful article. *Id*. Specifically, one can imagine the ornate metallic side sections being removed, and hung on a wall, where it would stand on its own as a work of art separate from the chair seat. (SOF, ¶ 25.) Further, the arrangement of metallic riveted panels, in

15

and of itself, comprises a two- (sometimes three-) dimensional artwork: the panels are uniquely and ornately designed, and could be removed from the underlying structure of the chair, where they could be displayed as a tableau of modern art (that evokes the Spitfire fighter plane). Each metallic side section and, separately, the riveted metal panel therein, would have been eligible for copyright protection as a sculptural and/or modern "engraving" work if it were hung on a wall, or displayed on a pedestal. *Star Athletica,* 580 U.S. ___ (slip op., 8).

There is no genuine dispute that the metallic side sections, and/or the arrangement of metallic riveted panels therein, "would have been eligible for copyright protection" as a graphic or sculptural work if they were originally fixed as a sculpture hanging on a wall. *Star Athletica,* 580 U.S. ___ (slip op., 8); *see* SOF, ¶ 25. Thus, the Aviator Tomcat Chair is copyrightable under *Star Athletica.*

### (f)    Halo's Mars Chair

Halo's design for the Mars Chair fulfills the standard for copyrightability under *Star Athletica.* (Numerous images of the Mars Chair are shown at Dkt. No. 67-1, pp. 28-35, and Halo has attached selected images as Ex. J.) First, the design includes two separate stainless steel metallic structures, which emerge together in a wishbone, and which envelop the seat and simultaneously serve as an armrest. (SOF, ¶ 29.)  Those metallic structures were designed to be "sculptural," and "to look like a piece of art." (*Id.*) The metallic structures include a "really artistic" "reveal in the side," "like a window" (or "gap") "in the side of the chair." (*Id.*)

Second, those features can exist as their own sculptural work, separate and apart from the chair. Indeed, the metallic structures were designed to look like they could be removed from the chair and serve as an independent artistic or sculptural work. (*Id.,* ¶ 29.)  Specifically, one can imagine the metallic structures being removed, and hung on a wall or displayed on a pedestal,

16

where they would stand on their own as a work of art separate from the chair seat. (*See id*.); *Star Athletica,* 580 U.S. ___ (slip op., 8). Thus, the Mars Chair is copyrightable under *Star Athletica*.

### (g)    Halo's Aviator Valkyrie Desk

Halo's design for its Aviator Valkyrie Desk is copyrightable under *Star Athletica*. (Numerous images of the Aviator Valkyrie Desk are shown at Dkt. No. 67-1, pp. 19-25, and Halo has attached selected images as Ex. K.) First, the design has graphic and/or sculptural qualities in the nature of Halo's Spitfire finish—an original two- (sometimes three-) dimensional pattern of stainless steel panels, riveted together in a unique and ornately- designed fashion. The design also reflects other sculptural qualities, like the abrupt bend that resembles the end of an airplane wing, and the curved leg with inlaid reveals. The original design elements of the Aviator Valkyrie Desk include the double curvature, "the way it slants, the [riveted] panels, [and] folding the metal over the corners." (SOF, ¶ 28.) With these sculptural features, the entire piece evokes the wing of the iconic World War II-era British Spitfire fighter plane, which, again, does not "advance the utility of the article" as a desk. *See Star Athletica,* 580 U.S. ____ (slip op., 13).

Second, the pattern of metallic riveted panels could be removed from the underlying structure, which would continue to serve as a desk or a table (but it would not appear as "attractive"). (*Id*., ¶ 27.) When removed from the desk, the arrangement of riveted metallic panels comprise a piece of modern art (that evokes the Spitfire fighter plane)—it would have been eligible for copyright protection as a sculptural tableau and/or a modern "engraving" work, if it were hung on a wall. *Star Athletica,* 580 U.S. ____ (slip op., 8).[9] In addition, the curvature of the desk, including the curved leg with bookshelves and the metallic "pleats" where the metal is folded over the corners, are sculptural qualities that could stand on their own as a work of

---

[9]This is true even though the metallic panels correspond to the shape of the underlying utilitarian structure. *Id.* (slip op., at 11).

modern art. They too would have been eligible for copyright protection had they been first fixed in a tangible medium before being applied to the desk. *Id.*

> **(h)    Halo's Blackhawk Coffee Table, Blackhawk Chest and Blackhawk Square Side Table**

Halo's designs for the Blackhawk Chest, Blackhawk Square Side Table and Blackhawk Coffee Table (collectively, "the Blackhawk Designs")[10] fulfill the standard for copyrightability under *Star Athletica*. (Numerous images of the Blackhawk Designs are shown at Dkt. No. 67-1, pp. 47-52, 55-59, 62-67, and Halo has attached selected images as Ex. L.) First, those designs feature graphic and sculptural qualities in the nature of a pattern of stainless steel panels, riveted together with a distressed, shiny metallic finish, with curved edges and curvature pleats riveted into each corner. (SOF, ¶ 31.) The circular metal handles are modeled after a motorbike petrol cap. (*Id.*) The riveting, metal panels and circular metal handles are graphic and sculptural qualities that are not necessary to render the products a chest, coffee table or side table. (*Id.*, ¶ 32.) Again, those features do not "advance the utility of the article" as either a chest, a coffee table or a side table. *See Star Athletica,* 580 U.S. ____ (slip op., 13).

Second, if the pattern of metallic riveted panels and circular metal handle pulls were removed from the underlying structure, the remaining product would which would continue to serve as a chest, coffee table or side table. (SOF, ¶ 32). When removed from the article, the arrangement of riveted metallic panels forms a piece of modern art that evokes the Spitfire fighter plane. It would have been eligible for copyright protection as a modern sculptural work, if it were hung on a wall, or displayed on a pedestal. *Star Athletica,* 580 U.S. ____ (slip op., 8).[11]

---

[10]The three Blackhawk Designs all feature the same original design elements. (SOF, ¶ 31.) The difference between each of the three product designs is generally one of scale—the rivet patterns share similarities, but they are unique based on the shape of each piece. (*Id.*)

[11]This is true even though the metallic panels correspond to the shape of the underlying utilitarian structure. *Id.* (slip op., at 11).

In addition, the curvature of the products, including the metallic "pleats," where the metal is folded over the corners, are sculptural qualities that could stand on their own as a work of modern art. They too would have been eligible for copyright protection—if they were fixed in another tangible medium before being applied to the desk. *See id*. Thus, the Blackhawk Designs are subject to copyright protection under *Star Athletica*.

### (i)    Halo's Globetrekker Coffee Table

Halo's design for the Globetrekker Coffee Table is likewise copyrightable under *Star Athletica*. (Numerous images of the Globetrekker Coffee Table are shown at Dkt. No. 67-1, pp. 147-153, and Halo has attached selected images as Ex. M.) First, the design features graphic and sculptural qualities in the nature of a pattern of stainless steel panels, riveted together with a distressed, shiny metallic finish, with curved edges and curvature pleats riveted into each corner. (SOF, ¶ 64.) The design also features wood strips that wrap around the table, and leather corner wraps, all of which appear to be locked in place by pins or studs. *Id*. With these features, the entire piece evokes the image and concept of a historical travel trunk. The riveting, metal panels, leather corners and wood strips are graphic and sculptural qualities that are not necessary for the product to be a coffee table. In other words, those features do not "advance the utility of the article" as a coffee table. *See Star Athletica*, 580 U.S. _____ (slip op., 13).

Second, the pattern of metallic riveted panels, wood strips, and leather corner wraps could be removed from the underlying structure, and serve as a piece of modern art that evokes a travel trunk. Those riveted panels, adorned with wood strips and leather corner wraps, would have been eligible for copyright protection as a sculptural work if they were hung on a wall as a modern artistic tableau. *Id*. (slip op., 8). Thus, the Globetrekker Coffee Table is copyrightable.

19

(j)     **Halo's Stonyhurst Lamp Table and Ampleforth Chest.**

Halo's designs for the Stonyhurst Lamp Table and the Ampleforth Chest fulfill the standard for copyrightability under *Star Athletica*. (Numerous images of the Stonyhurst Lamp Table and the Ampleforth Chest are shown at Dkt. No. 67-1, pp. 70-78, 81-87, and Halo has attached selected images as Ex. N.) First, the designs each include wooden bands (Stonyhurst) or leather strips (Ampleforth), which wrap around the sides and back of the article, as well as leather corners and edge wraps, and leather handles, all of which appear to be held in place by a large number of pins or studs.[12] (SOF, ¶¶ 33-34, 36.) All of those elements serve as graphic and/or sculptural qualities purely for adornment—while evoking the image of a vintage travel trunk, the pieces would not actually function as travel trunks. Those features do not "advance the utility of the article" as a lamp table or a chest. *See Star Athletica,* 580 U.S. ____ (slip op., 13).

Second, those elements are able to exist as their own as a graphic and/or sculptural work separate from the useful article. *Id*. Specifically, one can imagine the wooden bands (Stonyhurst) and leather strips (Ampleforth), as well as the leather corners, leather edge wraps, and leather handles being removed from the table  or chest, hung and displayed on a wall, and standing on their own as a separate work of modern art. Those features serve as "pure adornment" in the context of table or chest. (Ex. A, Ex. 16, at 71:5-72:15; 73:2-12.) CDI itself admitted that the wooden banding, leather strips, leather corners and edge wraps, and leather handles could be removed from the remainder of the article—i.e., the underlying structure of the table/chest—and that underlying structure (complete with its drawers), would still serve as a functioning table or chest. (SOF, ¶¶ 35, 37.) Those decorative features "would have been eligible for copyright

---

[12]While those elements would be "absolutely necessary" for a travel trunk, they serve as adornment for a furniture piece like a table or a chest. (*Id.*, ¶ 34.) The leather edging is "pure adornment"—it provides no "structural reinforcement," and the hundreds of pins or studs tacked therein are ornamental because the leather edging is glued to the article before the pins or studs are added. (*Id.*)

protection as a pictorial, graphic or sculptural work" if they had originally been fixed as a tableau of leather or stainless steel panels, onto which the wooden banding or leather strips, and leather corners, edge wraps and handles were affixed. *Star Athletica,* 580 U.S. ____ (slip op., 8). Thus, the Stonyhurst Lamp Table and the Ampleforth Chest are copyrightable under *Star Athletica*.

### (k)     Halo's Georgian Architectural Mirror

Halo's Georgian Architectural Mirror design is copyrightable under *Star Athletica*. (Images of the Georgian Architectural Mirror are shown at Dkt. No. 67-1, pp. 142-144, and Halo has attached selected images as Ex. O.) First, the design contains an extremely large mirror surrounded by an intricately-carved wood frame. (SOF, ¶ 62.) Among the carvings, the top part of the frame includes carvings that appear to be three vases, one on each of the right and left sides, and one in the middle. (*Id.*) Between each vase is a carving of two sets of "drapes." (*Id.*)

Second, those elements are able to exist as their own pictorial and/or sculptural work separate from the useful article. *Id.* Specifically, one can imagine the intricately-carved wood frame as being removed from the mirror, and standing on its own as a separate work of art. For example, the wood frame could be removed from the mirror and would serve as a piece of art or carved sculpture. Further, CDI's corporate designee admitted that the wooden frame around the mirror could be imaginatively removed from the utilitarian aspects of the mirror and (1) the mirror would still serve as a functioning mirror; and (2) the wood frame would stand as a "piece of art" or "carved sculpture." (*Id.*, ¶ 63.) As such, there is no genuine dispute that the Georgian Architectural Mirror "would have been eligible for copyright protection as a pictorial, graphic or sculptural work" if it had originally been fixed as an intricately-carved wood sculpture. *Star Athletica,* 580 U.S. ____ (slip op., 8). Thus, the Georgian Architectural Mirror product(s) fulfill the standard for copyrightability set forth in *Star Athletica*.

21

**(l)        Halo's Georgian Architectural Dining Table**

Halo's Georgian Architectural Dining Table design is copyrightable under *Star Athletica*. (Numerous images of the Georgian Architectural Dining Table are shown at Dkt. No. 67-1, pp. 132-139, and Halo has attached selected images as Ex. P.) First, the design contains a base made of two intricately wood-carved "pillars" or columns" ending in a "T" shaped based. (SOF, ¶ 60.) The pillars feature two "accordion-type" shapes of wood jutting in and out, as well as a separate "belly" section between two "accordion" sections.  (*Id*.) Those sculptural features are not necessary for the article to serve as a table; in fact, they do not "advance the utility of the article" as a table. (*Id*., ¶ 61; *Star Athletica,* 580 U.S. ___ (slip op., 13).)

Second, those elements are able to exist as their own sculptural work separate and apart from the remainder of the article. *Id*. Specifically, one can imagine the intricately wood-carved legs of Halo's Georgian Architectural Dining Table being removed from the table, displayed on a pedestal, and standing on their own as separate works of modern art, such as an "artistic column"—in part because the wood carving in the pillars is non-functional and serves as pure adornment. (SOF, ¶ 61.) Further, CDI's corporate designee admitted that the "accordion" and "belly" features of Halo's Georgian Architectural Dining Table could be imaginatively removed from the utilitarian aspects of the table and the table would still function as a table, while the wood-carved pillars with "accordion" and "belly" features would stand on its own as a piece of art. (*Id*.) There is no genuine dispute that the wood-carved legs of the Georgian Architectural Dining Table "would have been eligible for copyright protection as a pictorial, graphic or sculptural work" if they had originally been fixed as an intricately carved wooden sculpture. *Star Athletica,* 580 U.S. ____ (slip op., 8). Thus, the Georgian Architectural Dining Table is copyrightable under *Star Athletica*.

22

(m)     **Halo's Scaffolding Coffee Table and Scaffolding Console Table**

Halo's designs for its Scaffolding Coffee Table and Scaffolding Console Table (together, "the Scaffolding Table Designs") are copyrightable under *Star Athletica*. (Numerous images of the Scaffolding Table Designs are shown at Dkt. No. 67-1, pp. 174-185, 185-190, and Halo has attached selected images as Ex. Q.) First, the Scaffolding Table Designs contain two or more horizontal sections made from an industrial distressed metallic frame, with wooden panels that are placed front to back.  (SOF, ¶ 68.) The designs further include flat metallic rods in the shape of an "X" on the side of each table, as well as metallic caps on the corners of each table that appear to be attached to the table by tacks or bolts. (*Id.*) The "Scaffolding Table" products were designed to make them "look and feel like a bridge"; the original design elements include the metallic "X," the rivets, the caps on the corners, and running the wood front to back. (*Id.*, ¶ 69.) Those elements are sculptural qualities that evoke the image of an industrial bridge, and they do not "advance the utility of the article" as a table. *Star Athletica,* 580 U.S. ____ (slip op., 13).

Second, those elements are able to exist as their own sculptural work separate from the useful article. *Id*. Specifically, one can imagine the metallic "X," together with the rivets and the caps on the corners, being removed from the table, and standing on their own as a separate work of art. For example, the "X" with riveted caps could be displayed on a wall as a tableau, or set on a pedestal, where it would serve as a piece of modern art, in part because those features evoke the ironwork of an industrial bridge, and serve as pure adornment on a table. CDI's corporate designee admitted that the Scaffolding Tables could be designed such that the flat metallic "X" rods and the riveted caps were not necessary to support the structure of the table. (SOF, ¶ 70.) These features do not support the structure of Halo's tables, and thus the flat metallic "X" rods and the riveted caps (1) could be removed from the remainder of the article and it would still function as a table; and (2) the flat metallic "X" rods and riveted caps would stand on their own

23

as a "piece of art." As such, there is no genuine dispute that the flat metallic "X" rods and riveted caps "would have been eligible for copyright protection" as a graphic or sculptural work if they were originally fixed as a hanging tableau or pedestal-mounted sculpture. *Star Athletica,* 580 U.S. ____ (slip op., 8). The Scaffolding Table Designs are copyrightable under *Star Athletica*.

### (n)     Halo's Oviedo Chaise

Halo's Oviedo Chaise design is likewise copyrightable under *Star Athletica*. (Numerous images of the Oviedo Chaise are shown at Dkt. No. 67-1, pp. 165-171, and Halo has attached selected images as Ex. R.) First, the design includes a curved metallic frame attached to a leather cushion, which has stitching in several equidistant, horizontal lines that make the cushion tuft out into accordion-like pillows. (SOF, ¶ 65.) Further, the frame of the Oviedo Chaise can be rested on its side, without any cushion, and "it looks like a piece of art." (*Id*. ¶ 67.)

Second, those elements are able to exist as their own sculptural work separate from the remainder of the article. Specifically, one can imagine the accordion-like pillows being removed from the chair and standing on their own as a separate work of art—those pillows are merely adornment on such a chair. Further, CDI's corporate designee admitted that the accordion-like pillows are not necessary for the chair to serve as a lounge chair, and that a "flat piece of leather with some sort of foam inside" would serve the same purpose as the accordion-like pillows. (SOF,¶ 66.) Further, the frame of the Oviedo Chaise could be separated from the cushion and set on its side, where it would look "like a piece of art." (*Id*., ¶ 67.) There is no genuine dispute that the accordion-like pillows and/or the frame of the Oviedo Chaise "would have been eligible for copyright protection as a pictorial, graphic or sculptural work" if they had originally been fixed as an "S"-shaped sculpture with stitching to make accordion-like pillows, or as a metallic sculpture, respectively. *Star Athletica,* 580 U.S. ____ (slip op., 8). Thus, the Oviedo Chaise is copyrightable under *Star Athletica*.

## V.     HALO IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF CDI'S COUNTERCLAIM:  SHAM LITIGATION / ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT

### A.     The Required Elements for Sham Litigation / Attempted Monopolization Claims.

CDI's second counterclaim against Halo alleges that Halo filed a sham lawsuit in an attempt to monopolize the furniture and lighting market.[13] (Dkt. No. 94, pp. 31-34.) This counterclaim invokes the "sham litigation" exception to the Noerr-Pennington Doctrine, which provides immunity from antitrust liability.  *Eastern R.R. Presidents Conference v. Noerr Moto Freight*, 365 U.S. 127 (1961). A lawsuit is a sham when it is "both objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1071 (Fed. Cir. 1998); *Avnet, Inc. v. Motio, Inc.,* Case No. 12-C-2100, 2015 U.S. Dist. LEXIS 10799, at *19 (N.D. Ill. Jan. 30, 2015)). If the suit alleged to be sham litigation is not objectively baseless, the subjective motivation of the counter-defendant is irrelevant. *Asahi Glass Co. v. Pentech Pharm. Inc*., 289 F. Supp. 2d 986, 993 (N.D. Ill. 2003) (citing *Nobelpharma AB*, 171 F.3d at 1072).

A defendant's proof of a "sham lawsuit" merely deprives its adversary of immunity under the Noerr-Pennington Doctrine—it does not establish antitrust liability. *Mercatus Grp., LLC v. Lake Forest Hosp*., 641 F.3d 834, 854 (7th Cir. 2011). Thus, CDI must also allege an ***antitrust injury*** under § 2 of the Sherman Act—here, CDI asserts attempted monopolization. To prevail on a claim of attempted monopolization, CDI must show (1) that Halo has a "specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; and (3) a dangerous probability that the attempt of monopolization will succeed." *Id*.

---

[13] CDI does not contend that Halo's patent or trademark claims are sham litigation. CDI contends only that the Halo copyright claims constitute shams litigation since Halo "lacks the requisite registration." (Dkt. No. 94, ¶ 36.)

**B.** **CDI Cannot Establish Its Sham Litigation / Attempted Monopolization Claims.**

**1.** **Sham Litigation**

CDI cannot prove that the copyright claims at issue constitute sham litigation. This suit is **not** objectively baseless. CDI alleges that since Halo does not have registered copyrights for their product designs, Halo cannot recover for copyright infringement; thus, Halo's copyright claims must be objectively baseless. (Dkt. No. 94, ¶¶ 26, 30-31, 36). However, this Court has already ruled as a matter of law that Halo does not need U.S. copyright registrations to enforce its copyright rights. (Dkt No. 93.) All of Halo's works are foreign works[14] that are not subject to the formalities required by 17 U.S.C. § 411(a), due to the Berne Convention Implementation Act of 1988. Further, actions taken to protect one's valid copyright rights are immune under the Noerr-Pennington Doctrine. *See Thermos Co. v. Igloo Prods. Corp.*, 1995 U.S. Dist. LEXIS 18382, *15-*18 (N.D. Ill. Dec. 12, 1995). As shown above, CDI has expressly admitted that Halo's asserted furniture and lighting designs contain separable features that are protectable under U.S. copyright laws. Thus, Halo's claims cannot be objectively baseless, and Halo's subjective motivation is irrelevant. Even if it were relevant, CDI has set forth no evidence to prove that Halo was "subjectively motivated by a desire to impose collateral, anti-competitive injury."[15] Accordingly, Halo's copyright claims cannot be deemed to be sham litigation.

**2.** **Attempted Monopolization**

Second, CDI cannot establish Halo's purported attempted monopolization under Section 2 of the Sherman Act. CDI has notably presented **no** evidence whatsoever in support of its allegations—no evidence of a relevant market, or of Halo's market share or alleged monopoly.

---

[14]None of Halo's works are "United States works" under 17 U.S.C. § 101 because (1) Halo is domiciled and based in Hong Kong, China and has no headquarters in the U.S., and (2) all of Halo's asserted works were first published in countries outside of the U.S. (*See* Dkt. No. 67-1.)

[15]Rather, the evidence shows Halo has valid and enforceable copyrights, and CDI has copied nearly forty of Halo's original, copyrighted product designs.

First, CDI cannot show that Halo possesses monopoly power or a specific intent to achieve monopoly power in any relevant market. Monopoly power has been defined as "power over price," in the sense that a monopolist possesses the ability to "cut back the market's total output and so raise the price." *Indiana Grocery, Inc. v. Super Valu Stores, Inc*., 864 F.2d 1409, 1414 (7th Cir. 1989). In certain cases, market share is "at best" an indicator of this market power. *Id.* The ultimate inquiry in any attempted monopolization case remains whether the party has, or reasonably might come close to having, the ability to control total market output and prices. *Id.*

At the outset, CDI has provided no evidence to explain the relevant market they have vaguely described as "classical, industrial, rustic or reproduction furniture." (Dkt. No. 94, ¶ 32.) CDI has neither hired an expert to opine on the relevant market, nor has CDI attempted to show the rough contours of the relevant market.[16] When asked to further define the market, CDI merely responded "our type of look" or "our type of niche." (SOF, ¶ 79.)

Moreover, CDI has not provided ***any*** evidence that Halo has monopoly power or intent to achieve monopoly power in that alleged relevant market (e.g. evidence of market share or evidence supporting Halo's ability to cut back the relevant market's total output and raise prices)—and for good reason: CDI ***has no evidence*** supporting its claims. In fact, Halo's U.S. market share is ███████████████████ of the entire United States furniture market, a market that has been estimated to be between approximately $95 billion to $143 billion annually. (Ex. S, Declaration of Emily Haslam, ¶¶ 6-14.) It is not possible to control total market output and prices, or to monopolize a market, when one controls ██████████████ of that market. CDI cannot show that Halo has monopoly power, or a specific intent to achieve it.

---

[16]The "plaintiff always bears the burden of proving relevant market," so a plaintiff must "offer admissible evidence that is sufficient for a jury to find" that the proffered relevant market is accurate." *Menasha Corp. v. News America Marketing In-Store*, 238 F. Supp. 2d 1024, 1033 (N.D. Ill. 2003).

Second, CDI cannot prove predatory or anticompetitive conduct by Halo. Halo's demand letters to CDI and one of CDI's retailers, and this lawsuit, were all grounded in Halo's right to enforce its patents and trademarks (which CDI already stipulated are valid and enforceable, and were infringed by CDI ),[17] together with Halo's good faith belief in the validity of its copyrights. Again, CDI has admitted that certain of Halo's furniture and lighting designs contain separable features that are protectable under U.S. copyright laws. CDI has provided no evidence of Halo's "predatory" or "anticompetitive" conduct. Thus, CDI cannot carry its burden on this element.

Third, CDI cannot prove any possibility, much less a dangerous probability, that Halo's alleged monopolization will succeed. For this element, courts consider the counter-defendant's ability to commit the offense, the scope of its objective, and the character of its conduct. *Lektro-Vend Corp. v. Vendo Co*., 660 F.2d 255, 271 (7th Cir. 1981). Market performance, while not dispositive, is relevant to capacity to monopolize a market. *Id.* Numerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove dangerous probability of monopolization. *Id.* As noted above, Halo's U.S. market share is ████████████ of the entire U.S. furniture and lighting market. (Ex. S, ¶¶ 6-14.) This miniscule market share, coupled with no additional evidence from CDI to support its allegations, is insufficient to establish a dangerous probability that Halo's alleged monopolization will succeed.

Finally, CDI has no injury caused by Halo's alleged attempted monopolization. Its only grievance is its inability to sell products that it copied. CDI is free to design and manufacture its own original furniture and lighting products—it just cannot sell the enforceable product designs of others without authorization. CDI's business has no legally cognizable antitrust injury. Accordingly, the Court should grant summary judgment on CDI's antitrust claims.

---

[17] As discussed herein, CDI has already stipulated to Halo's ownership of exclusive patent rights and Halo's exclusive trademark rights in the mark ODEON™—and that CDI's products infringed those rights. (SOF, ¶ 1-4.)

## VI. HALO IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS III AND IV OF CDI'S COUNTERCLAIM – INTENTIONAL INTERFERENCE WITH PROPECTIVE ECONOMIC ADVANTAGE AND BUSINESS EXPECTANCY

### A. The Required Elements for Intentional Interference with Prospective Economic Advantage and Business Expectancy Claims.

To prevail on a claim of intentional interference with prospective economic advantage, CDI must prove: (i) a reasonable expectancy of entering into a valid business relationship; (ii) Halo's knowledge of that expectancy; (iii) an intentional or unjustified interference by Halo that caused a breach or termination of the expectancy, and (iv) damage to CDI resulting from Halo's interference. *Anderson v. Vanden Dorpl.*, 667 N.E. 2d. (Ill. 1996). The same elements are required for a claim of intentional interference with prospective business expectancy. *See United Phosphorus Ltd. v. Angus Chem. Co.*, 1996 U.S. Dist. LEXIS 203, at *27-28 (N.D. Ill. Jan. 9, 1996) (*citing Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170-171 (7th Cir. 1993)).[18]

### B. CDI Cannot Establish Its Claims of Intentional Interference

CDI cannot establish intentional interference with prospective economic advantage or business expectancy with RH.[19] First, CDI has not provided any, much less sufficient, evidence that it had a ***reasonable*** expectation of entering into a valid business relationship with RH. The only argument CDI has proffered is some undescribed, unsupported "expectation," based on some RH representative entering one of CDI's showrooms at a trade show. (SOF ¶ 72.) However, many people, including competitors, visit CDI's showrooms, and not every person or company that does so actually purchases something from CDI or forms a business relationship with CDI—the "mere fact that a person or company visited CDI's showroom does not mean that

---

[18] While *United Phosphorus* discussed the elements of "intentional interference with prospective business expectancy," *United Phosphorus* cites to the elements "tortious interference with prospective economic advantage in *Delloma*, meaning that these two claims are really the same, or at least comprise the same elements.

[19] CDI alleged that Halo interfered with CDI's reasonable expectations of entering into business relationships with unnamed "others," and with RH. (Dkt No. 94, ¶¶ 43, 45, 48, 50.) CDI has not alleged or provided any evidence regarding any other third parties, apart from RH, having relationships with CDI with which Halo allegedly interfered.

CDI has support for a reasonable expectation of entering into a business relationship with that person or company." (*Id.*, ¶ 73.) Further, CDI does not have ***any*** emails or other documentation showing RH expressing an interest in any of CDI's products, or that CDI ever contacted RH to even sell its products. (*Id.,* ¶ 74.) RH never requested any sample products from CDI. (*Id.*) CDI's only "evidence" is ███████████████████████████████████████████████████, of which Halo could have no knowledge. (*Id.,* ¶¶ 76-78.) CDI's "reasonable expectation" is nothing more than its "mere hope" of future business, but the "mere hope of future benefit does not rise to the level of the reasonable expectancy required to prove" tortious interference with prospective economic advantage. *Bodenstab v. J. R. Blank & Assocs., Inc*., Nos. 88 C 6125, 88 C 6135, 1989 U.S. Dist. LEXIS 679 (N.D. Ill. Jan. 25, 1989).█████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Under these circumstances, CDI cannot establish a reasonable expectation of a valid business relationship with RH, and thus the other elements of the tort claim are immaterial.[20] Accordingly, the Court should grant summary judgment and dismiss CDI's tortious interference claims.

## VII.  CONCLUSION

For the foregoing reasons, Halo respectfully requests that the Court grant partial summary judgment that Halo's owns valid and enforceable copyright rights in its asserted product designs, and summary judgment in Halo's favor on CDI's antitrust and tortious interference counterclaims.

---

[20]CDI's "business expectations" with RH were limited to ████████████████████████████████████ ████████████████████████████ (SOF ¶ 77.)  Further, any interference by Halo was justified by CDI's infringement. Finally, CDI has no evidence that it suffered any injury because of Halo.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **PLAINTIFFS' MEMORADUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was caused to be served on September 22, 2017 by electronic mail on the following counsel:

> Alastair J. Warr
> FisherBroyles LLP
> 203 North LaSalle, Suite 2100
> Chicago, IL 60601
> Mailing Address: P.O. Box 666
> Zionsville, IN 46077
> Alastair.warr@fisherbryoles.com

/s/ Barry R. Horwitz_____
Barry R. Horwitz