**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

HALO CREATIVE & DESIGN LIMITED, a Hong
Kong company, HALO TRADEMARKS
LIMITED, a Hong Kong company and HALO
AMERICAS LIMITED, a Hong Kong company,

     *Plaintiffs and Counter-Defendants*

          v.

COMPTOIR DES INDES INC., a Quebec
corporation, CDI INTERNATIONAL, and CDI
FURNITURE,

     *Defendants and One Counter-Plaintiff.*

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:14-cv-08196

Judge Harry D. Leinenweber

Magistrate Judge Susan E. Cox

**REDACTED**

**HALO'S OPPOSITION TO CDI'S MOTION TO EXCLUDE,
IN PART, DAMAGES OPINIONS OF MICHAEL D. PAKTER**

Plaintiffs Halo Creative & Design Limited, Halo Trademarks Limited and Halo Americas Limited (collectively, "Halo"), by their attorneys, hereby submit the following memorandum in opposition to Defendants' ("CDI") Motion to Exclude, In Part, Damages Opinions of Michael D. Pakter, and CDI's Brief in Support of same ("Br."):

## INTRODUCTION

CDI's Brief begins by falsely claiming that the Copyright Act, 17 U.S.C. § 504(b), does not permit certain categories of damages assessed by Halo's expert Michael Pakter. Specifically, CDI suggests that Halo's claims for lost future profits and for CDI's indirect profits (i.e., profits CDI earned from non-infringing products) are categorically prohibited by the statute. (Br., at 1.) CDI is wrong—many courts have held that "actual damages" under § 504(b) may include future losses. *Cohen v. US*, 100 Fed. Cl. 461, 482-83 (2011) (collecting cases).[1] Further, to ensure that infringers do not profit by their wrong, the Copyright Act permits copyright plaintiffs to recover even indirect profits. *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F. 3d 700, 708 (9th Cir. 2004); *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003). Once again, CDI hopes to avoid the consequences of its own actions by misleading the Court, this time, into precluding damages arguments for anything other than CDI's direct (and, in some cases, admitted) infringement. As set forth below, CDI has used Halo's designs to dramatically increase its profits for its non-infringing sales, and Halo is entitled to recover some or all of those profits.

## BACKGROUND FACTS

Halo has been in the business of designing, manufacturing and distributing original and unique furniture and lighting products for over ten years. (Ex. 1, Deposition of Timothy Oulton ("Oulton Depo."), pp. 15-18.) Halo has been selling its products in the United States since at

---

[1] Including *Mary Ellen Enters. v. Camex, Inc.*, 68 F.3d 1065, 1070 (8th Cir. 1995) and *Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 15 (2d Cir. 1981).

least 2004. (*Id.*) Halo's philosophy is to make the "best in class product"; many of its products are inspired by antiques, but Halo changes and modernizes such antiques to put its "stamp on it," to make the new, modernized product "epic," "iconic" and unique. (*Id.* pp. 18-22.) One of Halo's most epic, iconic products, the Aviator Valkyrie Desk, was featured on the hit CBS television show "Two and a Half Men." (Dkt. No. 67, ¶ 14; Ex. 2, HALO_12297-99.) ███████████

████████████████████████████████████████████████████████████

████████████████████████████████. (Dkt. No. 131-1, ¶ 7.) In fact, several of Halo's asserted product designs—including the Gyro Crystal Chandelier, the Crystal Chandelier, and the Georgian Architectural Dining Table—are ██████████████████████████

██████████████. (Ex. 1, Oulton Depo., pp. 105-107, 115-118, 121-123.)[2]

Restoration Hardware is among the biggest trend-setting retailers in the U.S. for furniture and lighting products—according to CDI's CEO, David Ouaknine, who was asked if CDI monitored Restoration Hardware's catalogs and product lines: "Restoration Hardware is the biggest -- everyone looks at Restoration Hardware. They're a . . . staple in our industry." (Ex. 3, Deposition of David Ouaknine ("Ouaknine Depo."), pp. 114-15.) CDI's Director of Product Development Jonathan Malka described Restoration Hardware as "the strongest retailer in the North American market" in the category of high-end furniture. (Ex. 4, Deposition of Jonathan Malka ("Malka Depo."), pp. 30-31.)[3]

CDI made its debut in the United States by exhibiting at a showroom at the High Point Market Showplace in October 2012, as part of CDI's "planned expansion into the U.S. market."

---

[2] The Georgian Architectural Dining Table and Georgian Architectural Mirror were also featured on the cover of Restoration Hardware's catalog. (*Id.*, pp. 131-133.)
[3] Further, when CDI's customer, Buhler Furniture, emailed CDI's sales representative with the subject line ███ ███████████████ and the entire body of the email consisted of a ███████████ CDI's own sales representative responded that it was a ████████ ███████████████████████████ (Ex. 3, Ouaknine Depo., pp. 116-120; Ex. 5, CDI-21404.)

(Dkt. No. 30-5, p. 2.) At the time, David Ouaknine, CDI's "president and head buyer," falsely claimed that many of CDI's "designs are patented . . . to protect their originality." (*Id.*) In reality, CDI had exactly **zero** original designs to its name at the time.[4] Rather, CDI purchased all of its products from manufacturers in Asia—sometimes after viewing them in trade shows (Ex. 3, Ouaknine Depo., p. 37; Ex. 4, Malka Depo., pp. 22-25), but other times ████████████████████ ████████████████████████████████████████████████████████. (Ex. 4, Malka Depo., pp. 196-203; Ex. 6, CDI-44618, Ex.7, CDI-41643, 667-668.)

When CDI first began selling its products in the U.S., it did not simply purchase any old products from Asian manufacturers. Rather, CDI ████████████████████████████████ ████████████████████████ to those being sold by Restoration Hardware[5]—including all of Halo's asserted product designs, as well as other products sold by Restoration Hardware that were **not** designed or manufactured by Halo. For example, CDI sold an industrial shelving unit and a sofa to its customer Cella Luxaria, ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████. (Ex. 8, CDI-36632-38.)[6] CDI copied **numerous** Restoration Hardware products.[7]

CDI made no attempts to hide its blatant copying of Restoration Hardware: CDI sold many of its copied products under the same name as Halo's genuine products sold by Restoration Hardware. For example, Restoration Hardware sells Halo's ODEON-branded lights under the

---

[4] CDI has never provided any evidence that it has ever owned any patents for any of its product designs. Despite claiming patent rights in 2012, it is undisputed that CDI did not even hire its first designer until July 2014. (Ex. 4, Malka Depo., pp. 20.)
[5] *See* Dkt. No. 131-1, ¶¶ 11-12 ████████████████████████████████████████████.
[6] This letter also shows that ████████████████████████████████ (*Id.*, CDI-36632; *see also* Ex. 9, U.S. Design Pat. No. D667,654 and CDI's Industrial Media Console, which is still being sold today.) The letter further claimed that ████████████████ ████████. (Ex. 7, CDI-36634, 37.)
  (*See* Ex. 10.) Mr. Pakter calculated the percentage of CDI's revenue earned from infringing **Halo's** rights in its earliest sales for several of CDI's U.S. customers (Dkt. No. 175-1, Supplemental Schedule 4.0), but those large percentages are even higher when the infringing revenues include CDI's copies of (non-Halo) Restoration Hardware products. (*See* Ex. 11 relying on data from Dkt. No. 175-1, Supplemental Schedule 4.1).)

3

name "1920s Odeon Clear Glass Fringe" chandelier and lamps (Dkt. No. 179, p. 7), while CDI

sold its copies under the name "1920s Odeon Glass Fringe"—and CDI has already admitted that

its use of that name and of the word "Odeon" infringes Halo's ODEON mark. (Dkt. No. 131-1, ¶

4.) Halo's "Zig Zag" lighting products are sold by Restoration Hardware under the product name

"Spencer"—and CDI sold its corresponding copies under the exact same "Spencer" name. (Ex.

4, Malka Depo., pp. 157-158.)  In fact, Halo is aware of at least one customer who ███████

████████████████████████████████████████████████████████████████████████

████████████████. (Ex. 12, HALO-6680-90.)When CDI did not use the same exact name as

Restoration Hardware, it used names that were virtually the same,[8] marketed its products to its

customers as CDI's ██████████████████████[9] and gave its sales representatives

spreadsheets comparing CDI's prices with corresponding retail prices at Restoration Hardware.[10]

CDI copied Restoration Hardware as part of its master strategy to break into the U.S.

market, as if the strategy were CDI's only way to survive. CDI's "growth" for the years 2010

and 2011 was ██████████████████. (Dkt. No. 175-1, Supplemental Schedule 5.0.) In

the year 2012, *after* CDI first began selling infringing copies of Halo's and Restoration

Hardware's designs in Canada, CDI's growth ██████████████████ (*Id.*) For CDI's fiscal

year 2013, which began October 1, 2012—the very same month CDI made its U.S. debut at High

Point Market—CDI's growth ██████████████. (*Id.*) That is the same fiscal year in which CDI

landed its first sales with Gilt Groupe, Joss & Main, Cella Luxaria, Amazon.com, and Haute

Look (a division of Nordstrom)—and **all** of those first sales to those *brand new* customers

---

[8] Halo's "Mars Chair" is sold by Restoration Hardware as the "Atlantic Coupe Chair," while CDI sells its copy as the "Pacific Coupe Chair." (Ex. 4, Malka Depo., pp. 214-215.) Further, CDI originally referred to some of its goods as its "Aviator" line, similar to Halo's Aviator Valkyrie Desk and Aviator Tom Cat Chair, before CDI changed the name to its "Aero" collection.
[9] (Dkt. No. 131-1, ¶ 11 n. 1 and Exhibit 5.)
[10] (Ex. 4, Malka Depo., pp. 49-52; Ex. 13, CDI-34455.)

involved a significant amount ████████████████ [11] of products that infringed Halo's asserted patents, trademarks and/or copyrights. (Dkt. No. 175-1, Supplemental Schedule 4.0.) Over the next few years, CDI grew its sales with those customers, and lured additional customers with its copies of Halo and Restoration Hardware products; in 2014, CDI's annual growth was up another ████, while in 2015, CDI's annual growth ████████. (*Id*., Schedules 4.0, 5.0.)

In short, CDI built its business in the United States by copying, with a maniacal attention to "exactness," Restoration Hardware—the "hottest retailer" and the "strongest" one for high-end furniture, for whom Halo has created and sold several best-selling and iconic designs. CDI used its copies of Halo's and Restoration Hardware's goods to lure and develop relationships with new customers; CDI rode on the coattails of, and was unjustly enriched by, the goodwill and market recognition of Halo's products, including products that were patented, featured on a hit television show, and some of the all-time bestsellers at trend-setter Restoration Hardware, where they were almost exclusively available. The subject of this motion is primarily Halo's right to recover at least some of CDI's profits from its non-infringing sales, based on CDI's use of Halo's goodwill and market recognition to build its business in the United States—profits "that are attributable to the infringement." 17 U.S.C. § 504(b).

## I.  Legal Standards

### A.  The *Daubert* Standard

"The rejection of expert testimony is the exception rather than the rule"—even though the trial court acts as a "gatekeeper," that role "is not intended to serve as a replacement for the adversary system." *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1150 (N.D.Ill. 2001) (quoting Fed. R. Evid. 702 advisory committee's note). Rather,

---

[11] The percentage of copied products is even higher when one considers product names and designs that CDI copied from Restoration Hardware that were not designed by Halo. *See* note 7, above, and exhibits cited therein.

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). Despite the so-called "gate-keeping function, the court's focus is on the expert's methodology, while the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000) (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786).[12] While CDI places a significant emphasis on the four *Daubert* factors, that emphasis is highly misplaced here: even though *Daubert* applies to damages testimony offered by accountants or economists, "the Daubert factors are not to be rigidly applied in this or any other context." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 803 n. 7 (N.D. Ill. 2005) (further noting that the factors "may not be applicable at all" in some contexts "or may have diminished utility," and citing another court that held the factors "do not conform easily to an analysis of economic theory").[13] The Supreme Court itself reiterated that *Daubert's* test is "flexible," and its "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

### B.    Copyright Plaintiffs May Recover Indirect Profits, and Associated Burdens.

The Copyright Act's damages provision, §504(b), does not distinguish between direct and indirect profits, and thus courts allow the recovery of indirect profits. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.

---

[12] *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration").

[13] The court also noted: "In determining the admissibility of expert testimony with respect to future lost profits, a trial judge has considerable leeway in determining the testimony's reliability." *Id*.

3d 700, 708 (9th Cir. 2004).[14] Even though indirect profits may be more difficult to quantify, the burden of proof remains the same for both direct and indirect profits: the copyright plaintiff must demonstrate a causal nexus between the infringement and the claimed profits. *Andreas*, 336 F.3d at 796; *Polar Bear Prods.*, 384 F.3d at 710; *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 517 (9th Cir. 1985) (*Frank Music I*) (holding that a statement in MGM's annual report that its gaming operations were "materially enhanced by the popularity of the hotel's" infringing stage revue sufficiently established a causal nexus between the infringement and the gaming profits). Other than proving the causal nexus, § 504 merely requires a plaintiff to prove the defendant's revenues; the defendant then has the burden to prove not only its deductible costs, but also the amount of profit not attributable to the infringement—that is, defendant holds the burden of apportionment. *Polar Bear Prods.*, 384 F.3d at 711;[15] *Andreas*, 336 F.3d at 795-96 (also noting that any doubt as to the computation of costs or profits is resolved in plaintiff's favor, and that where a defendant fails to meet its burden of proving costs or apportionment, the gross revenue figure stands as the profits plaintiff may recover).

The Seventh Circuit has clearly held that CDI's profits earned on non-infringing products can be recovered, provided that Halo establishes a causal connection between such products and the infringement. *Bucklew*, 329 F.3d 923, 933 (7th Cir. 2003) ("HAB argues that damages can never be obtained that are based on the profits that the infringer made from the sale of a product that did not infringe the copyright. That is incorrect"—and citing *Frank Music I*).[16] Despite

---

[14] Any profits "that are attributable to the infringement" are awarded to prevent infringers from benefitting from their wrongful acts, to discourage infringement, and to render infringement "worthless to the infringer." *Id.*; *Andreas*, 336 F.3d at 796; *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 931, 933 (7th Cir. 2003); *see Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F. Supp. 404, 406 (N.D. Ill. 1976).

[15] *See id.* (summarizing: Section "504(b) creates a two-step framework" for recovering indirect profits: (1) the copyright owner "must first show a causal nexus between the infringement and the gross revenue"; and (2) the infringer then "bears the burden of apportioning the profits that were not the result of infringement").

[16] *See also Devore Family P'ship, LLP v. McDougal Littel*l, No. 06 C 3484, 2006 WL 2861116, at *3 (N.D. Ill. Sept. 26, 2006) (allowing claim for indirect profits at pleading stage) (citing *Polar Bear Prods.* 384 F.3d at 710-11);

CDI's own reliance on that case, CDI falsely claims that Halo's Category C "is contrary to the law of this circuit." (Br., p. 6.)[17] CDI also improperly inflates Halo's burden and the amount of causation it must show, claiming that Mr. Pakter opined that the "sole result" of CDI's sales of the infringing products was that CDI "opened the door" to sales of non-accused goods. (Br., at 7.)[18] But a plaintiff need only "proffer some evidence" that "the infringement *at least partially caused the profits* that the infringer generated as a result of the infringement." *Polar Bear Prods.*, 384 F.3d at 711 (emphasis added).[19] Moreover, there is "no requirement" that a plaintiff put the defendant's "customers on the witness stand to testify that they purchased" the goods *because of the infringement*. *Id*.; *Andreas*, 336. F.3d at 797.[20] Rather, "a copyright plaintiff must present *a modicum of proof*" linking the infringement to the profits sought." *Polar Bear Prods.*, 384 F.3d at 711 (emphasis added).

---

*Zimnicki v. Gen. Foam Plastics Corp.*, No. 09 C 2132, 2011 WL 833601, at *2 (N.D. Ill. Mar. 3, 2011) (allowing discovery on indirect profits) (citing *Bucklew*, 329 F.3d at 933).

[17] Notably, CDI "provides no binding precedent in support of [its] conclusory allegation that [Halo is] barred from" claiming such profits. *Wells v. Hi Country Auto Group*, 982 F. Supp. 2d 1261, 1267 n. 4 (D.N.M. 2013). Even if the Seventh Circuit had not expressly approved of plaintiffs recovering such profits in *Bucklew*, there would be no binding precedent *prohibiting* the recovery of such profits. In that case, the Court could consider persuasive authority from other circuits for guidance, such as the *Business Trends* and *Sunset Lamp* cases cited in CDI's Brief and Mr. Pakter's expert report. *In re VMS Securities Litigation*, 21 F. 3d 139, 143 (7th Cir. 1994); *Apex Plumbing Supply v. US Supply Co.*, 142 F. 3d 188, 192 (4th Cir. 1998); *Vaughn v. Ruoff*, 253 F. 3d 1124, 1129 (8th Cir. 2001).

[18] (*See also* Br., at 4 (stating: "CDI's actions cannot be the sole reason for Halo's decision to discontinue" products).

[19] *Phoenix Renovation Corp. v. Rodriguez*, 439 F. Supp. 2d 510, 519 (E.D. Va. 2006) ("Defendants misconceive the nature of Phoenix's initial burden under § 504(b). It is not necessary for Phoenix to establish that the copyright infringement was the sole reason that Defendants garnered the revenue in question, or even that the infringement was a major factor in producing this revenue stream. Phoenix's initial burden is merely to establish a causal link between the infringement and the claimed revenue. The fact that Defendants' profits may be attributable to factors other than the infringement reveals the need for an apportionment of profits, but under § 504(b), the burden for such an apportionment belongs to Defendants").

[20] These Eighth and Ninth Circuit *dicta* stand in direct contrast to CDI's suggestion from the *Sunset Lamp* case that the only "credible evidence of a relationship" between the non-infringing and infringing goods might be "testimony from [defendant's] purchaser at a department store that it canceled an order for many items in the Sunset line" because of the infringing lamp. (Br., p. 10 (quoting 749 F. Supp. 520, 524 n. 2 (S.D.N.Y. 1990).) Such testimony was merely *an example* of the type of evidence that may show a relationship between infringing and non-infringing goods (*see id.*, n. 2)—but two appeals courts have held that such direct testimony is *not* necessary to establish the causal nexus, and *Sunset Lamp*'s mere example to the contrary is not controlling here.

## II.     Argument

### A.  Halo Properly Claims CDI's Profits for Its Non-Infringing Products (Category C)

As shown above, the law of this circuit allows Halo to recover CDI's profits from its non-infringing products, provided that profit is linked to CDI's infringement products. *See Bucklew*, 329 F.3d at 933. CDI claims that this theory lacks factual support and is based on untested methods that are not generally accepted. (Br., p. 6.) CDI is wrong.

CDI mainly complains that Mr. Pakter did not "identify any causal link" between the profits from non-infringing sales and CDI's infringement, other than the percentage of infringing revenues that CDI's U.S. customers ordered in their first purchase from CDI. (Br., p. 7.) But Mr. Pakter merely used that percentage as a guidepost in analyzing whether that sales relationship began as a result of CDI's infringement.[21] CDI's real problem with Mr. Pakter's opinion is that he ***assumed*** multiple facts, including that (1) CDI's first sale to certain customers was a driving factor in CDI's success and growth of that customer relationship; and (2) CDI's successful relationship with those customers resulted from the infringing products. (Br., p. 7.) CDI complains that Mr. Pakter could not identify any facts in support of those assumptions, and that "assuming such facts without supporting evidence makes Mr. Pakter's opinion speculative and unreliable." (Br., pp. 7-8.) CDI provides absolutely no support for that assertion— or for its claim that Mr. Pakter's inability to identify the percentage boundaries that make his calculations valid somehow "renders his methodology untestable, speculative and overreaching." (Br., p. 8.)

In fact, damages experts routinely assume facts to render their opinions. *US Gypsum Co. v. Lafarge North Am. Inc.*, 670 F. Supp. 2d 737, 741-42 (N.D. Ill. 2009) ("Davis is an expert on

---

[21] While Halo will establish additional facts beyond those percentages, both at trial and below, that is not the only evidence upon which Halo's claim for CDI's profits on non-infringing goods is predicated. For this reason, Mr. Pakter's "refusal to identify a percentage of initial sales at which his method would be inapplicable" does not render the method untestable or unreliable. (Br., p. 8.) The percentage of initial infringing sales is simply one fact showing how important the infringing goods were in helping CDI get its foot in the door with its new customers.

damages, not liability, and she seeks to opine only on what the damages should be if the jury separately finds the facts she assumes to be true").[22] It is **Halo—not Mr. Pakter**—that holds the burden of establishing the causal link between the claimed profits on non-infringing products and CDI's infringement. *Andreas*, 336 F.3d at 796; *Polar Bear Prods.*, 384 F.3d at 710. Mr. Pakter's assumptions do not render his opinions unreliable. Mr. Pakter's opinions are reliable because he "reasonably employed the analytical tools of [his] trade in assessing damages," he provided a detailed analysis of CDI's infringing vs. non-infringing sales, and he "presented all of the formulas and schedules on which [he] relied in making [his] calculations"—his techniques can be challenged objectively, and CDI's expert, Ms. Distler, did exactly that by relying on the very schedules Mr. Pakter provided. *US Gypsum Co.*, 670 F. Supp. 2d at 741.

CDI tries to distinguish *Sunset Lamp Corp. v. Alsy Corp.* because it involved a plaintiff's own lost profits for its sales of non-infringed products that would have been sold in the same product line as its infringed products,[23] rather than a defendant's profits for its non-infringing products. 749 F. Supp. 520, 521-22 (S.D.N.Y. 1990). But CDI overlooks that the same reasoning applies in both cases: in *Sunset Lamp*, the plaintiff claimed it *would have sold more **unprotected products*** if its copyrighted lamp had not been infringed, as the copyright-protected lamp would

---

[22] *See id.* (further noting that the expert understood the assumed facts "will be established at trial"; and that plaintiff "bears the burden of establishing the factual predicate necessary for admission of Davis's conditional opinions on damages, and the jury will decide whether to accept or reject that factual predicate"); *Family Worship Ctr. Pentecostal Church of Holiness, Inc. v. See*, No. 09-cv-0094, 2012 U.S. Dist. LEXIS 141417, *6-*7 (E.D. Wis. Sept. 30, 2012) ("an expert is permitted to assume facts and provide an opinion based on those facts"; "if the truth turns out to be different from what the expert was told to assume, the jury can disregard the expert testimony"); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2013 WL 5955666, *2 (N.D. Cal. Nov. 6, 2013) ("Davis may assume those conclusions as fact in her testimony because her assumptions will be based on foundational testimony given at trial"); *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 1319553, *4 (E.D. Tex. Apr. 10, 2017) ("it is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages") (collecting cases).

[23] Halo agrees with CDI that damages theories based upon a copyright owner's lost profits must be distinguished from claims for the infringer's profits (Br., at 11)—categories (c) and (d) in CDI's motion are for CDI's profits; category (b) is for Halo's lost future profits. For claims of the infringer's profits, the burden is shifted to the infringing defendant to prove, beyond speculation, that the costs deducted and apportionment is reliable. *See Andreas*, 336 F.3d at 797, n. 2. Even though the *Sunset Lamp* case involved a plaintiff's claim for lost profits, its reasoning is instructive in the context of a claim for CDI's profits, as described below.

have been used to "open the door" to new types of business for the plaintiff—including sales of both the copyright-protected lamp, and plaintiff's unprotected products. *Id*. Here, Halo claims that CDI **did sell** *more* **unprotected (non-accused) products** because of the infringement: CDI's ability to offer "exact" copies of Halo's and Restoration Hardware's patent, copyright and trademark-protected products enticed many of CDI's new U.S. customers, and "opened the door" to CDI's sale of non-infringing products and long-term relationships with those customers.

Halo need not even rely on *Sunset Lamp*. Under § 504, Halo is entitled to recover CDI's "profits attributable to the infringement"—which is not limited to direct profits. *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1550 (9th Cir. 1989) (*Frank Music II*) (upholding an award of a percentage of MGM's total profits for its hotel guest accommodations, restaurants, cocktail lounges, star entertainment, "the movie theater, Jai Alai, the casino itself, convention and banquet facilities, tennis courts, swimming pools, gym and sauna" because the infringing stage show contributed to those profits). Here, CDI's indirect profits include its profits from non-infringing products, and its increased profitability from the use of Halo's designs (Categories C & D), and Halo need only establish a causal relationship between the claimed profits and CDI's infringement. *Andreas*, 336 F.3d at 796; *Polar Bear Prods.*, 384 F.3d at 710.

While more evidence is likely to come out at trial, there is already sufficient evidence in the record to prove that CDI used the infringing products as a lure to hook its U.S. customers, which enabled CDI to form relationships with those customers—and sell more of its infringing **and** non-infringing products than CDI would have ever sold if it did not use its infringing products as bait.[24] Indeed, beyond the initial sales percentages identified by Mr. Pakter, there is

---

[24] The Court should bear in mind, as background, that (i) CDI offered and sold numerous products corresponding to products originally sold by Restoration Hardware (many of which are Halo's product designs) (Ex. 4, Malka Depo., pp. 49-55; Ex. 10); (ii) CDI sold its copies of Halo's Zig Zag lighting products under the name "Spencer," the same name that Restoration Hardware uses to sell those products (*id*., pp. 157-158); (iii) Halo is aware of at least one

sufficient email evidence showing that CDI customers Cella Luxaria,[25] Gilt Groupe,[26] Joss & Main,[27] and Home Decorators Collection,[28] were more interested in, or valued more highly, CDI's copies of Halo's (and Restoration Hardware's) products than CDI's non-accused products. *See Polar Bear Prods.*, 384 F.3d at 712-13 (finding plaintiff proved "the requisite causal connection").

CDI argues that its profits from non-infringing products cannot be recovered because there is no evidence "that CDI bundled its non-infringing products with the Accused Products." (Br., p. 9.) But *Bucklew* merely identified bundling as **one possible basis** for recovering indirect profits—it did **not** hold that bundling is **required** to recover indirect profits. 329 F.3d at 933.[29]

---

person who ███ ██████████████████████████████████████ (Ex. 12); (iv) CDI sent documents to manufacturers requesting they ████████████████████████████████ (Ex. 4, Malka Depo., pp. 195-99); (v) CDI ██████ ██████████████████ (*id.*, pp. 205-207; Ex. 3, Ouaknine Depo., pp. 132-36); (vi) David Ouaknine stressed to his manufacturers that the product they make for CDI ████████████████████████████ (*id.*, pp. 140-42); (vii) many of Halo's products were, or were almost, exclusive to Restoration Hardware; and (viii) several of its products are Restoration Hardware's best sellers. *See also* notes 5-10 above, and accompanying text.
[25] Cella Luxaria's initial list of products to ████████████████████████████████████████ and Cella Luxaria specifically wanted █████████ at the entrance of its store. (Ex. 14, CDI-4224-25; Ex. 10.) ████████████████████████████████████████████████████. (Ex. 7, CDI-36632-34.)
  On or around December 10, 2012, CDI sent a list of proposed products to sell to Gilt. (Ex. 15, CDI-8819-8844.) The list included ██████████████████████████████████████████████████████████████ ██████████████████████ as well as CDI's copies of ██████████████████████████████████████████, among others. (*Id.*) In its email of December 28, 2012, Gilt suggested it would █████████████████████████████████████ (Ex. 15, CDI-8826.) That ███████████████████████████ defines the Halo and Restoration Hardware products listed above, and those are the very first products Gilt purchased from CDI. (*Id.*, CDI-8844; Dkt. No. 175-1, Supplemental Schedule 4.1.)
[27] On October 9, 2014, Joss & Main sent to CDI a list of Joss & Main's "Top 10 Most Loved" products—number 10 on the list is CDI's copy of ████████████████. (Ex.16, CDI-26322.) Notably, none of CDI's non-accused products made the list.
[28] On September 2, 2016, CDI sent an email to █████████████████████████████████████████████ ██████████ (Ex. 17, CDI-26137.) The lighting collection CDI attached, from its catalogue, is substantially comprised of copies of Halo's and Restoration Hardware's most popular lighting products, including the best-selling Gyro Crystal Chandelier and Crystal Chandelier. (Ex. 18, CDI-26138, 140-41.)
[29] Further, "*Bucklew* found the evidence there too speculative" (Br., p. 9) because the plaintiff's theory was that "one-stop shopping attracted customers who might otherwise have gone to a competitor" and no evidence was

CDI's claim that "no court in this Circuit has applied the *Business Trends* reasoning" or the *Sunset Lamp* case is irrelevant. [30] (Br., pp. 9-10.) The evidence clearly shows CDI's use of infringing products to lure customers, and that CDI's customers preferred CDI's infringing products to products CDI did not copy from Halo or Restoration Hardware.

Finally, CDI argues that Mr. Pakter's theory "has not been tested," subjected to peer review or publication, "has an unknown potential rate of error, and is not generally accepted within the relevant scientific community." (Br., p. 11.) But Mr. Pakter's opinion is not scientific, nor does it require peer review or a known error rate.[31] The question before the Court is very simple: did CDI establish its base of distributors in the U.S. by luring those customers with Halo's original, best-selling designs, which were mainly available only at Restoration Hardware, the "hottest retailer" around? Mr. Pakter assumed this to be the case, the evidence supports the assumption, and the trier of fact must determine if the assumption is well-founded.[32] That CDI disagrees with the assumption goes to the weight of the argument, not its admissibility: "This is not a case where the expert bases his opinions on facts that are of so little weight that his opinion should not be admitted at all." *Engenium Solutions, Inc. v. Symphonic Technologies, Inc.*, 924 F. Supp. 2d 757, 773 (S.D. Tex. 2013). Accordingly, the Court should deny CDI's motion to exclude Halo's theory for recovering CDI's profits from its non-infringing sales (Category C).

---

presented that tied defendant's infringement to its profits from non-infringing sales. Here, the theory is not mere speculation: the evidence above shows that CDI used Halo's and Restoration Hardware's designs and product names to get its foot in the door with U.S. retailers.

[30] CDI tries to distinguish the *Sunset Lamp* case because CDI's non-infringing products were "not even in the same product lines as the Accused Products." (Br., p. 11.) Again, this is irrelevant. Halo need only establish a causal link between CDI's profits for non-infringing sales—the products need not be bundled or in the same product line.

[31] *Thomas v. City of Chattanooga*, 398 F. 3d 426, 431 (6th Cir. 2005) ("it may not make sense to apply some of the *Daubert* factors, such as the rate of error analysis, to non-scientific testimony"); *Loeffel Steel Prods*, 387 F. Supp. 2d at 803 n. 7 (certain *Daubert* factors "may not be applicable at all" in some contexts; they "do not conform easily to an analysis of economic theory"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

[32] *See* note 22, above, and accompanying text.

### B. Halo Properly Claims CDI's Increased Profitability (Category D)

Once again, CDI asserts that Mr. Pakter's opinion "is contrary to the law of this circuit" (Br., p. 11) without providing any support for that claim. Further, CDI claims that this opinion "relies on several erroneous assumptions lacking evidentiary support" (*Id.*), but as shown above, Mr. Pakter's assumptions do not provide any basis for excluding the opinion—CDI simply needs to disprove the assumption at trial.

In attacking Mr. Pakter's assumptions, CDI complains that "Mr. Pakter doesn't know anything about how [the] industry average [he relies on] is calculated," such as what companies were included or the methodology involved. But CDI provides no authority to support this complaint, and relevant case law holds that an expert need not know the inner workings of an industry calculation such as average growth to rely on it, if it was from a reliable publication. *See Weir v. Crown Equipment Corp.*, 217 F.3d 453, 465 (7th Cir. 2000) ("Federal Rule of Evidence 703 demands that experts obtaining data from reports use only reports reasonably relied on by experts in the field"). CDI's expert, Ms. Distler, admitted that the IBISWorld report Mr. Pakter relied on for the average growth calculation is a "respected publication" and a reliable source, which she has relied on herself in the past. (Ex. 19, Distler Depo., pp. 11-12.) Thus, it is irrelevant that Mr. Pakter does not know how the industry average was compiled, because experts in his field reasonably rely on that publication. Fed. R. Evid. 703; *Weir*, 217 F.3d at 465.

CDI argues that the average annual growth rates on which Mr. Pakter relies from the IBISWorld report "show no relationship to CDI's historical growth rates" (Br., p. 12), but CDI can argue this at trial to disprove Mr. Pakter's assumptions. CDI claims to have contradictory evidence, such as that the industry growth rate outpaced CDI one year and then lagged behind CDI's growth the next (Br., p. 12-13), and that CDI "secured significant customers in the last

two years, including American Signature / Value City Furniture." (Br., p. 13 n. 7.) Regrettably, these claims continue CDI's record of making unfounded statements helpful to its case that are not supported or based on any admissible evidence.[33]

CDI faults Mr. Pakter for assuming that CDI's growth "was attributable *solely* to CDI's" infringement, arguing he did not consider other factors that might have contributed to CDI's growth. (Br., p. 13.) But it is **CDI's** burden to consider those factors and apportion those profits that are **not** attributable to the infringement. *Polar Bear Prods*., 384 F.3d at 711; *Andreas*, 336 F.3d at 795-96. Given that it is CDI's burden, Mr. Pakter's alleged failure to consider any factors has no bearing on the admissibility of his opinions.

CDI argues that, in considering whether plaintiff established the requisite causal nexus, courts "should examine all relevant market factors, including the extent to which the parties have an **existing market share, channels of distribution and customer relations**." (Br., p. 14 (quoting 6 William F. Patry, PATRY ON COPYRIGHT, § 22:104 (2011).) CDI had absolutely **no** market share, channels of distribution or customer relations in the United States before October 2012, when it first exhibited at the High Point Market Showplace, as part of CDI's "planned expansion into the U.S. market." (Dkt. No. 30-5, p. 2.)[34] Thus, it is clear that there is a correlation between CDI's beginning its infringement in 2012 and CDI's expansion to the United States toward the

---

[33] The latter point is one of two statements CDI makes as the "multiple credible explanations" in the record for CDI's revenue growth besides its infringement. (Br., p. 13, n. 7.) The other statement is that CDI hired its first furniture and product designer in July 2014, and now employs a team of designers. (*Id*.) CDI again offers no evidence on this point (it is undisputed—*see* Dkt. No. 131-1, ¶ 9), but any such products designed by CDI's earliest designers could not have hit the market until 2015, when CDI had already used Halo's designs and goodwill to build and expand its foothold in the U.S. market, and create greater economies of scale, from which it continues to profit to this day.

[34] As also set forth above, CDI's "growth" for the years 2010 and 2011 was ██████████, respectively. (Dkt. No. 175-1, Supplemental Schedule 5.0.) In the year 2012, after CDI first began selling infringing copies of Halo's and Restoration Hardware's designs in Canada, CDI's growth suddenly reached ████. (*Id*.) For CDI's fiscal year 2013, which began October 1, 2012—the same fiscal year in which CDI landed its first sales with Gilt Groupe, Joss & Main, Cella Luxaria, Amazon.com, and Haute Look using Halo's iconic designs—CDI's growth exploded to ████. (*Id*.) Over the next few years, CDI grew its sales with those customers, and lured additional customers with its copies of Halo and Restoration Hardware products; in 2014, CDI's annual growth was ████, while in 2015, CDI's annual growth reached ████. (*Id*., Schedules 4.0 & 5.0.)

end of the same year, after which time CDI developed its market share in the U.S., its channels of distribution, and its customer relationships—directly off the back of Halo's original designs. *See Charter Sch. Capital, Inc. v. Charter Asset Mgmt. Fund, L.P.*, No. CV 14-3385-GW(PLAX), 2016 WL 5921062, at *3 (C.D. Cal. Apr. 1, 2016) (denying summary judgment, and allowing plaintiff to argue for indirect profits at trial, where plaintiff (like Halo) was a "first mover" in its field, and defendant (like CDI) acted as a "free rider," by using plaintiff's copyrighted financing agreement, where the "trier of fact could reasonably conclude that Defendants avoided increased costs—and therefore enjoyed increased profits" by simply adopting plaintiff's work—much like CDI avoided design costs by copying Halo's work).

Once again, CDI overreaches when it complains that Mr. Pakter's report "does not attempt to tie CDI's 'increased profitability' to" CDI's enhanced goodwill. (Br., p. 14.) That is a fact that Mr. Pakter properly assumed, and which Halo must establish at trial—Mr. Pakter's assumption does not render his opinion speculative or unreliable.[35] CDI notes that "no court in this Circuit has applied the reasoning in *Business Trends*" to award a defendant's "increased profitability or enhanced goodwill" (Br., p. 14), but CDI provides no binding precedent holding such awards are forbidden; it merely cites cases involving failures of proof. However, each of those cases is distinguishable from the facts presented here, and Halo's claim for CDI's profits is significantly less attenuated than the theories presented in those cases.[36]

---

[35] *See* note 22, above, and accompanying text.

[36] *See Burns v. Imagine Films Entm't, Inc.*, 2001 WL 34059379, *4 (W.D.N.Y. Aug. 23, 2001) (rejecting plaintiff's premise that defendant's use of **portions** of plaintiff's copyrighted **screenplay** for the movie *Backdraft* would allow plaintiff to recover "a portion of the profit from Universal Studios theme park attributable to the "*Backdraft* attraction*," because that attraction is one of many in the theme park and plaintiff failed to offer any accurate method for calculating "how many people (a) went to the theme park because of "*Backdraft*" and (b) would not have gone if it had a different attraction"); *Lawton v. Melville Corp.*, 1997 U.S. App. LEXIS 15228, *5-*6 (2d Cir. 1997) (affirming denial of the infringer's profits where plaintiff presented only proof of the infringer's gross revenues, failed to provide any evidence "that those revenues were caused by the infringement," and the lower court "did not err in requiring Lawton **to establish <u>some</u> degree of causation**"—plus, Halo will prove causation here, and CDI's enhanced goodwill is not "unquantifiable" here); *Frank Music II*, 886 F.2d 1545, 1553-54 (9th Cir. 1989) (granting

16

The reasoning of *Business Trends Analysts v. Freedonia Grp., Inc.* applies with full force here, even though the evidence in that case was found to be insufficient.[37] Unlike the cases CDI cites, Halo has significant evidence that CDI copied not only Halo's product designs and product names—Halo will testify at trial that CDI copied Halo's "signature" marketing ploys associated with Halo's goodwill. For example, Halo owns numerous trademark registrations throughout the world for images of a bowler hat (Ex. 20, HALO_43-72), and Halo and Timothy Oulton stores use bowler hats as part of their marketing strategies (Ex. 21, HALO_12310-11 (depicting servers at the June 2012 opening of Halo's Timothy Oulton store in Dallas wearing bowler hats while serving customers); Ex. 22, HALO_12315). Halo will also testify that it created several trade show booths around 2009-2011, in which the outside of the booth was decorated to look as if the booth was one of Halo's trunks. (*See, e.g.,* Ex. 23, HALO_14964-70.) By no coincidence, CDI's own trade show booths have repeatedly featured people wearing bowler hats (*See, e.g.,* Ex. 24, HALO_12263, 14973-74). Not content with merely selling copies of Halo's Stonyhurst Lamp Table, CDI copied Halo's use of an oversized trunk to adorn its trade show booth by producing a super-sized version of that lamp table as its trade show booth, complete with large wooden banding that appears to be locked in place by pins or studs, edging that appears to be similarly attached, and large leather handles—all as inspired by Halo's steamer trunk furniture design. (*See* Dkt. No. 131-1, ¶¶ 33-34.) When CDI's CEO David Ouaknine was recognized as one of "12 Guys with Badass Jobs in Montreal," the blog post featured only one picture of him— leaning against CDI's copied trade show booth. (Ex. 25, HALO_12241.) CDI's copying of

---

that the hotel's profits have a sufficient nexus with the infringing stage revue, but denying plaintiff's recovery of the profits of ***the defendant's parent company*** MGM, Inc., because that parent company has "its own interests and activities other than the MGM Grand") (emphases added in each).

[37] 887 F.2d 399, 407 (2d Cir. 1989) ("we emphasize that we are not rejecting as a matter of law a view of 'profits' under Section 504(b) that might include enhanced good will or market recognition. We hold only that the proof in the instant case is inadequate to support such an award").

Halo's products, product names and marketing strategies enhanced CDI's market recognition and goodwill, and enabled CDI to grow and build even bigger economies of scale, as evidenced by CDI's massive growth during the years in which it infringed. Moreover, there is evidence that CDI's copying of Halo and Restoration Hardware "actually influenced the purchasing decisions" of those that bought CDI's products.[38] *Polar Bear Prods.*, 384 F.3d at 714-15.

In sum, there is sufficient evidence in the record to support a finding that, in addition to copying Halo's product designs and names, CDI knowingly copied Halo's original marketing strategies, including its bowler hat "trademark" and trade show booth concept—all in an attempt to capitalize on Halo's goodwill and market recognition. Further, CDI's attempt succeeded: it built a substantial base of distributors in the U.S. using its copied products and marketing strategies, and CDI has increased its profitability off the back of Halo's efforts, with CDI and Mr. Ouaknine receiving accolades and recognition based on his copying of Halo's work. Accordingly, the Court should deny CDI's motion to exclude Halo's theory for recovering CDI's increased profitability from the use of Halo's designs and marketing efforts (Category D).

### C. Halo's Lost Profits On Its Discontinued Products (Category B)

While Halo believes CDI's claims on this issue are wrong, in view of the Court's ruling today, Halo does not intend to present argument at trial on this issue.

### D. The Cases CDI Cites Actually Favor Halo's Positions In This Case.

As noted above throughout this brief, several of the cases CDI cites are distinguishable, and do not support CDI's position at all. For example, CDI relies on *Baldwin Cooke Co.* to

---

[38] (*See, e.g.,* Ex. 26, CDI-0003559 (CDI's customer stating that ███████████████████ ████████████████████████████████████████████████████████████ ; Ex. 27, CDI-34503-509 (discussing CDI's vendor's changes ████████████████████████████████ , with CDI's CEO stating ████ ████████████████████████ ; *see* notes 10, 25, and 26 above, and accompanying text.)

suggest that Halo's claim for lost profits on discontinued products is speculative (Br., p. 5)—but that case actually supports Halo's Motion *in Limine* No. 6, holding that "generally accepted accounting principles would preclude the allocation of administrative expenses and general overhead, ***absent a showing that they had in fact increased in some degree***"[39] as a result of the infringement. 420 F. Supp. 404, 406 (N.D. Ill. 1976) (emphasis added).

As another example, CDI claims that *Andreas* "held that relying on *Sunset Lamp* as authority for recovering profits on [non-infringing] items where infringement enhances sales of a 'door opener' product 'takes the reasoning of that case too far.'" (Br., p. 10, n. 5.) In fact, *Andreas* found that the plaintiff there introduced "enough circumstantial evidence" to prove the causal nexus between Audi's infringement and the claimed profits for non-infringing goods. 336 F.3d at 796-97. CDI again overreaches: the "too far" language in that case referred to plaintiff's attempt to recover Audi's profits for ***all*** of Audi's cars—not just the TT coupe featured in the infringing commercial. *Id.* at 799-800. By contrast, Halo merely seeks CDI's profits for a small number of CDI's customers that CDI lured into business relationships using the infringing goods.

Finally, CDI's reliance on *Bucklew* is misplaced: that case approved of recovering indirect profits, and did not require bundling. *Bucklew* also supports Halo's claims that its asserted product designs are copyrightable: the Seventh Circuit's requisite standard for originality is significantly lower than that imposed by the Copyright Office.[40]

---

[39] *See* Dkt. No. 180 ("CDI has provided no admissible evidence to establish that its sales of the infringing products required CDI **to hire <u>additional</u>** inventory or quality control employees, **pay <u>additional</u>** broker fees, or **pay for <u>additional</u>** transport or storage space, beyond <u>all of those resources that were required [for] CDI's non-infringing products</u>," and thus the costs have no nexus to CDI's infringement) (emphases added).

[40] *See* 329 F.3d at 928-29. Halo likewise claims copyright in designs "configured in an optional way" that are "the product of format choices that are not unavoidable, for which indeed there were an immense number of alternative combinations, any one of which [CDI] was free to use in lieu of' Halo's; "originality" in the context of works based on existing public domain works "means little more than a prohibition of actual copying"—such that CDI's and the Copyright Office's claims of Halo's use of "basic geometric shapes" and cursory dismissal of Halo's originality is wholly irrelevant, if Halo has evidence of CDI's actual copying. Here, Halo has that in spades.

## III.     Conclusion

For the foregoing reasons, Halo respectfully requests that the Court deny CDI's motion to exclude any of the damages opinions of Michael Pakter.


Dated: January 17, 2018                             Respectfully Submitted,

By:     /s/ Richard D. Harris
Richard D. Harris
Barry R. Horwitz
Jacqueline V. Brousseau
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois  60601
Telephone:  312-456-8400
Fax:  312-456-8435

*Attorneys for Plaintiffs and Counter-Defendants*
*Halo Creative & Design Limited, Halo Trademarks*
*Limited and Halo Americas Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I electronically filed the foregoing HALO'S OPPOSITION TO CDI'S MOTION TO EXCLUDE, IN PART, DAMAGES OPINIONS OF MICHAEL D. PAKTER with the Clerk of Court using the CM/ECF system, which will send notification of such filings to all counsel of record.


Dated:  January 17, 2018                          /s/ Richard D. Harris

21